Rodolphe NOEL et al.,
Plaintiffs-Appellants,

v.

Leonard H. CHAPMAN, as Commissioner of the Immigration and Naturalization Service and Sol Marks, as New York District Director of the United States Immigration and Naturalization Service, Defendants-Appellees.

No. 86, Docket 74–1447.

United States Court of Appeals,
Second Circuit.

Argued Nov. 8, 1974.

Decided Jan. 3, 1975.

Leon Friedman, New York City (American Civil Liberties Union Foundation, New York City, Melvin L. Wulf, New York City, Pollack & Kramer, Brooklyn, N. Y., Fried, Fragomen & Del

Ray, New York City, Austin T. Frago-men, Jr., Martin L. Rothstein, New York City, of counsel), for plaintiffs-appellants.

Lydia E. Morgan, Sp. Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the Southern District of New York, Mary P. Maguire, Sp. Asst. U. S. Atty., of counsel), for defendants-appellees.

Before KAUFMAN, Chief Judge, and ANDERSON and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from on order of Hon. Lee P. Gagliardi, United States District Judge for the Southern District of New York, entered on February 8, 1974, denying the motion of the appellants for a preliminary injunction in accordance with his opinion of February 6, 1974. We affirm.

I

Rodolphe Noel is an alien and a native and citizen of Haiti. He was admitted to this country on May 24, 1969 as a non-immigrant visitor for pleasure. This status permitted him to stay here for two months. He did not make a timely departure but remained here illegally until he was apprehended by agents of the Immigration and Naturalization Service (INS) on June 15, 1972. Deportation proceedings were thereupon promptly commenced. At a hearing on June 27, 1972, Noel admitted that he was deportable and represented that he was willing and able to leave the country at his own expense. He was given until September 27, 1972 to depart voluntarily. He again failed to leave and a warrant of deportation issued on July 12, 1973. Noel was advised by letter to report on August 21, 1973 for deportation. Instead of reporting, Noel requested an extension of his time to depart for an indefinite period because, on April 13, 1973, he had married Emiris Noel, a lawful permanent resident of the United States. This marriage, he urged, had exempted him from the requirement of obtaining a labor certification before applying for an immigration visa. 8 U.S.C. § 1182(a)(14). If an indefinite extension of voluntary departure were granted, Noel would, in effect, be allowed to remain in this country an additional period of as much as two years until a visa became available. The request was denied but deportation was stayed for seven days to permit the institution of court action.

Antoine Petit's position is like unto Noel's. He is an alien and a native and citizen of Haiti who was admitted here on August 4, 1970 as a visitor for pleasure for a two-month stay. He did not leave but rather obtained employment in violation of his non-immigrant status. Londono v. INS, 433 F.2d 635 (2d Cir. 1970) (*per curiam*). He was apprehended on June 7, 1973. Deportation proceedings were promptly commenced, and, at his hearing on June 8, 1973, Petit admitted that he was deportable and requested that he be permitted to depart voluntarily. He was extended the privilege of voluntary departure until July 8th, 1973. Instead of departing, Petit married Yanick Petit on June 26, 1973. His bride had entered the United States a week before as a permanent resident immigrant. Petit also applied for an extension of voluntary departure until a visa became available. The District Director, by letter dated July 18th, 1973, denied the request and ordered his departure by July 27th, 1973. Petit did not leave and, on August 6, 1973, a warrant of deportation was issued, ordering his departure for Haiti on September 5, 1973.

On August 24, 1973, Noel and Petit and their brides commenced this action in the United States District Court for the Southern District of New York, seeking a declaratory judgment that the policy of the INS as to extensions of voluntary departure for the relatives of resident aliens was unconstitutional, and further seeking a preliminary injunction enjoining the INS from deporting Noel and Petit. While initially commenced as a class action, the class claim has since been abandoned. Although technically the appeal here is from an order denying

a preliminary injunction, the opinion of the court below finally determined the underlying legal and constitutional issues so that the case is ripe for plenary appellate review. Sound judicial administration requires us to avoid subsequent unnecessary proceedings in the district court. See FTC v. Cinderella Career & Finishing Schools, Inc., 131 U.S.App.D.C. 331, 404 F.2d 1308, 1311 (1968); Hurwitz v. Directors Guild of America, Inc., 364 F.2d 67 (2d Cir.), cert. denied, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966); 9 J. Moore, Federal Practice ¶ 110.25 [1] (2d ed. 1973).

## II

It is undisputed that aliens who are the parents, children or spouses of an American citizen may enter the country without numerical limitation and need not obtain labor certification, regardless of where they are from. 8 U.S.C. §§ 1151(b) and 1182(a)(14). Aliens who are the parents, children or spouse of a resident alien and who are not from the Western Hemisphere are also exempt from the labor certificate requirement, id. § 1182(a)(14), and receive a special right of preference over others seeking a visa within the relevant quota limit of 170,000, id. § 1153(a). However, if the aliens are from the Western Hemisphere and are parents, children or spouses of a resident alien, they are exempt from the labor certificate requirement, id. § 1182(a)(14), but they receive no preference rights, i. e., they, along with all other Western Hemisphere aliens, may obtain visas subject to the 120,000 numerical quota, Act of Oct. 3, 1965, Pub.L. No. 89-236, § 21(e), 79 Stat. 921. These differences in treatment between aliens' and citizens' relatives and between Eastern Hemisphere and Western Hemisphere alien relatives of resident aliens were specifically provided for by the 1965 major congressional amendments to the Immigration and Nationality Act which abolished the national origins quota system. Act of Oct. 3, 1965, *supra*.[1]

Since at least 1952, the law has provided that the privilege of voluntary departure may be granted to a deportable alien at the discretion of the Attorney General. Immigration and Nationality Act of 1952, ch. 5, § 244, 66 Stat. 214, presently codified at 8 U.S.C. § 1254. By regulation, the authority to extend the time within which to voluntarily depart is within the sole discretion of the District Director of the INS. 8 C.F.R. § 244.2. INS policy between 1968 and June 1972 in the New York District had been more liberal than that elsewhere in the nation. Western Hemisphere aliens, such as Noel and Petit, who were in this country and married to permanent resident aliens had been routinely granted extended voluntary departure until an immigrant visa became available. However, on June 27, 1972, Congressman Rodino, Chairman of the House Judiciary Committee, advised the Commissioner of INS that hearings of his Subcommittee on Immigration and Nationality had indicated that the employment of illegal aliens in this country was unfavorably influencing the domestic job market and that routinely permitting them to remain in the United States to await visas was no longer justifiable. The Service informed all its District Directors that, as of July 31st, 1972, Western Hemisphere aliens should not routinely be granted extended departure time, but rather should be offered that privilege only in those cases where compelling circumstances warranted the relief. On April 10, 1973, the policy was liberalized to provide that the earlier New York policy granting extended departure would be applied to those aliens who were present in the United States and who had the requisite family status on or before April 10, 1973. Neither Noel nor Petit was married on April 10, 1973, and hence each is subject to deportation,

---

1. Prior to 1965, immigration from the Western Hemisphere was not numerically controlled. The prior non-quota status of such aliens was abolished by the 1965 amendments and the special annual quota of 120,000 was established, separate from the annual 170,000 worldwide quota.

which has been voluntarily extended by the Service until this litigation is terminated.

Had Noel and Petit married American citizens they would not have been subject to numerical immigration limits. 8 U.S.C. § 1151(b). The INS policy with respect to such aliens is to allow them the privilege of an extension of voluntary departure until they obtain visas, which involves a significantly shorter wait than in the case of an alien married to a resident alien who is subject to numerical limitations. Appellants contend that the INS policy is illegal. They claim (a) that there is nothing in the 1965 amendments to the law which requires the INS to distinguish between immediate family members of resident aliens, on the one hand, or of citizens, on the other, for the purpose of setting voluntary departure dates; (b) that the policy of the INS violates the equal protection concepts inherent in the due process clause of the fifth amendment,[2] and constitutes an abuse of administrative discretion; and (c) that the policy was issued in violation of the Administrative Procedure Act, 5 U.S.C. § 553. They seek to have the policy voided and to receive the benefits of the old policy under which they may await visas here along with the immediate relatives of American citizens.

### III

The attack upon the constitutionality of the policy of the Service is bottomed upon the contention that alienage is a suspect classification, that, since the policy provides for disparate treatment of the alien spouses of citizens and resident aliens, and, furthermore, since the classification impinges upon the fundamental right of the family to remain intact, the policy must be subject to strict scrutiny. Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

The cases relied upon by appellants are not controlling here. In Graham v. Richardson, *supra*, the Court found unconstitutional two state programs which denied welfare benefits to non-citizens or granted them only to aliens who had resided in the United States for a specified time. In Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the Court found that a New York statute violated equal protection rights since it provided that only citizens would be eligible for civil service appointments. In In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), the Court on a similar basis invalidated a citizenship requirement for admission to the Connecticut bar examination. These cases involved action by states which discriminated with respect to the rights and privileges which persons living in this country possess. None involved the power of INS to administer the immigration laws of the United States, which by their very nature involve the question of alienage.[3]

The Supreme Court has consistently held that Congress has plenary power in

2. If a classification would violate the equal protection clause of the fourteenth amendment, then it would also be invalid under the due process clause of the fifth amendment. Johnson v. Robison, 415 U.S. 361, 364 n. 4, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The fourteenth amendment applies to the states but not to the federal government, which is restricted only by the fifth amendment.

3. In an effort to escape the argument that *Graham, Sugarman* and *Griffiths* involved actions by *states* infringing the rights of aliens, appellants also cite several cases in which *Federal* restrictions upon the rights of aliens have been struck down. Mow Sun Wong v. Hampton, 500 F.2d 1031 (9th Cir. 1974), cert. granted, 417 U.S. 944, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); Ramos v. United States Civil Service Comm'n, 376 F.Supp. 361 (D.P. R.1974) (three-judge court); Diaz v. Weinberger, 361 F.Supp. 1 (S.D.Fla.1973) (three-judge court). Briefly stated, these cases hold that exclusion of aliens from federal civil service employment and imposition of a durational residency requirement as a condition for eligibility for Medicare are unconstitutional. With the Supreme Court cases discussed above, these cases do not go further than to declare that the federal and state governments cannot treat aliens legally residing in this country differently from citizens with regard to certain rights or privileges. The Su-

the area of immigration. Thus in Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), Mr. Justice Frankfurter wrote:

> Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. . . . But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government.

347 U.S. at 531, 74 S.Ct. at 743 (citations omitted).

Recently, in Kleindienst v. Mandel, 408 U.S. 753, 766, 92 S.Ct. 2576, 2579, 33 L.Ed.2d 683 (1972), the Court reaffirmed the plenary power of Congress, quoting with approval the opinion of the first Mr. Justice Harlan in Lem Moon Sing v. United States, 158 U.S. 538, 547, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1895):

> "The power of congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications."

■ There can be no doubt but that Noel and Petit as unadmitted and nonresident aliens have no constitutional

right to enter and to remain in this country. See Galvan v. Press, *supra*, 347 U.S. at 530–532, 74 S.Ct. 737. It is equally clear that their wives as resident aliens have no constitutional right to keep them here on the theory that the integrity of the family is protected by equal protection principles. The cases relied upon by appellants to support the contrary contention, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) and Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), involved interferences by states and not INS, and thus cannot control decision in an area in which, as we have noted, the Government has broad powers. Other precedents suggest the error of appellants' position. In Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), the Court upheld the right of the Government to refuse to validate an American passport for travel to Cuba despite the claim that there was an interference with the constitutional right of the citizen to travel. In Kleindienst v. Mandel, *supra*, the Court upheld the refusal of the Attorney General, through INS, to waive visa requirements of an alien scholar despite the claim of American intellectuals that their first amendment rights to hear, speak with and debate the foreign professor were violated. More directly in point is Silverman v. Rogers, 437 F.2d 102 (1st Cir. 1970), cert. denied, 402 U.S. 983, 91 S.Ct. 1667, 29 L.Ed.2d 149 (1971), in which the court refused to enjoin the deportation of an alien who was married to an American citizen despite the claim that the action was unconstitutional since it destroyed

---

preme Court has stated the essential significance of these cases as follows:

> The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide "in any state" on an equality of legal privileges with all citizens under non-discriminatory laws.

Takahashi v. Fish and Game Comm'n, 334 U.S. 410, 420, 68 S.Ct. 1138, 1143, 92 L.Ed. 1478 (1948), relied upon in Graham v. Richardson, *supra*, 403 U.S. at 374, 91 S.Ct. 1848.

These authorities are inapposite in the context of the enforcement of the immigration laws against aliens who, rather than living

lawfully in this country, are by their own admission deportable. An examination of some of the cases cited by appellants themselves reveals a recognition by the courts of the relevancy of the fact of alienage in certain situations and the breadth of executive power over enforcement of the immigration laws. Sugarman v. Dougall, 413 U.S. at 646–649, 93 S.Ct. 2842; Kleindienst v. Mandel, 408 U.S. 753, 765–767, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); Graham v. Richardson, 403 U.S. at 376–380, 91 S.Ct. 1848; Ramos v. United States Civil Service Comm'n, 376 F.Supp. at 366 n. 8.

the constitutional rights of the parties to live together in marriage. The same argument was rejected in Swartz v. Rogers, 103 U.S.App.D.C. 1, 254 F.2d 338, cert. denied, 357 U.S. 928, 78 S.Ct. 1373, 2 L.Ed.2d 1372 (1958). Judge Prettyman commented succinctly:

> Certainly deportation would put burdens upon the marriage. It would impose upon the wife the choice of living abroad with her husband or living in this country without him. But deportation would not in any way destroy the legal union which the marriage created. The physical conditions of the marriage may change, but the marriage continues. Under these circumstances we think the wife has no constitutional right which is violated by the deportation of her husband.

254 F.2d at 339.

■ In view of the plenary power vested in Congress to fix and in the executive to enforce, the terms and conditions of entry and stay in the United States, alienage cannot be a suspect classification in this context, nor is there an interference with any fundamental rights to marry and to raise a family. This being so, it follows that the strict or compelling interest test espoused by appellants cannot be applied in this case.

The Government has argued that the appropriate standard of review of the INS policy before us is the flexible approach taken by this court in Boraas v. Village of Belle Terre, 476 F.2d 806 (2d Cir. 1973). It had been suggested that Supreme Court doctrine in the equal protection area had evolved from a two-tiered standard to a less rigid formula which allowed for consideration of factors otherwise largely ignored. Gunther, The Supreme Court, 1971 Term—Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972). Although the precise contours of an appropriate intermediate test remained somewhat unclear, Comment,

Equal Protection in Transition: An Analysis and a Proposal, 41 Fordham L.Rev. 605 (1973), this court applied that test in Boraas. However, the Supreme Court refused to apply an intermediate test in San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), despite the strong urging of a dissent, 411 U.S. at 98–110, 93 S.Ct. 1278 (Marshall, J., dissenting), citing, inter alia, Gunther, supra. More recently, the Supreme Court reversed the decision of this court in Boraas and decided the issue of certain zoning restrictions on the basis of the traditional limited scrutiny standard. Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). It is thus unclear whether or not the Court accepts the intermediate test which courts and scholars had perceived in some of its recent decisions. Citizens Committee for Faraday Wood v. Lindsay, 507 F.2d 1065 (2d Cir. 1974). However, even if the intermediate test retains some vitality, we conclude, in light of the extensive power over immigration possessed by the INS, that the limited scrutiny test should be applied here, as it was in Rodriguez and Boraas, supra.

■ There is a rational relationship which supports the policy of INS under attack here. The 1965 amendments reflect the purpose of Congress "to protect the American economy from job competition and from adverse working standards as a consequence of immigrant workers entering the labor market . . .." S.Rep.No.748, 89th Cong., 1st Sess., 1965 U.S.Code, Cong. & Admin. News., p. 3329. It was the Congress which made the distinction between immediate relatives of American citizens and permanent resident aliens and which entrusted the Attorney General with jurisdiction to grant extended voluntary departures to Western Hemisphere aliens. Although this policy was exercised liberally in the New York District, by 1972 a long waiting list of such aliens developed and the wait for an immigrant visa approached the period of two years.[4]

---

**4.** The appellants admit in their brief that "[u]nder present conditions, after the filing of a Western Hemisphere visa application and the contemporaneous assignment of a priority date for visa assignment, the subsequent wait for visa assignment can be as long as 22 months or more."

Western Hemisphere aliens were coming to the United States in large numbers and remaining illegally in the expectation of a marriage which would assure their continuing residence here. In view of domestic employment problems which continue to affect American workers, the policy of INS to discourage the practice is understandable and certainly bears a rational and substantial relationship to the avowed purpose of Congress to protect the American economy. Wong Wing Hang v. INS, 360 F.2d 715, 718–719 (2d Cir. 1966). The fact that greater liberality is accorded to the spouses of American citizens is, in our view, a matter of the discretion of INS which, as we have pointed out, is plenary in this area.

Certainly there is no abuse of discretion in the cases before us. Both Noel and Petit had been initially granted the privilege of voluntary departure pursuant to their request, but had then abused it. Under these circumstances, there is no reason for judicial interference. See Bowes v. INS, 443 F.2d 30 (9th Cir. 1971) (*per curiam*); United States ex rel. Lee Pao Fen v. Esperdy, 423 F.2d 6, 8–9 (2d Cir. 1970). In fact, granting the relief sought would place Noel and Petit in a position of precedence over those Western Hemisphere aliens who have made applications for visas in regular course and who are awaiting their turn for admission. There is no reason to prefer those who have flouted the immigration laws, which permitted their entry for a limited time and purpose, over those who have steadfastly and patiently followed legal procedures.

## IV

The appellants here finally contend that the INS policy is invalid since it violates the Administrative Procedure Act, 5 U.S.C. § 551 et seq. Section 553(b) and (c) requires that an agency which proposes to issue a rule must publish a notice in the Federal Register indicating the time, place and nature of the public rulemaking procedure, and give interested parties an opportunity to participate in the rulemaking by submission of data. It is admitted that no such notice was provided here. Nor is there any contention made that the appellants had any actual notice of the INS policy change which would excuse publication in the Federal Register. See United States v. Aarons, 310 F.2d 341, 348 (2d Cir. 1962).

■■■■ Although the Act does exempt from judicial review agency action which is committed to agency discretion by law, 5 U.S.C. § 701(a)(2), it seems settled that we do have jurisdiction to review exercises of INS discretion to determine whether they are arbitrary or capricious. See Foti v. INS, 375 U.S. 217, 228–230, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963); United States ex rel. Hintopoulos v. Shaughnessy, 353 U.S. 72, 77, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957). On this basis we have already determined that there was no such abuse here. Although no authority precisely in point has been found, it would seem clear that we also have jurisdiction to determine whether or not INS followed the Act's rulemaking procedures. INS argues that the appellants have no standing to attack the procedure since none of them was married at the time the change in policy was made. Mrs. Petit was not even in the country on August 1, 1972 or on April 10, 1973, when the policy was made and modified respectively; her husband was not apprehended until June, 1973; and both Noel and Petit had represented prior to their marriages that they would leave voluntarily. The status or whereabouts of Mrs. Noel does not appear in the record; we know only that she did marry her husband on June 27, 1973, which was after the dates in question. We need not, however, reach the question of standing here since section 553(b)(A) exempts "general statements of policy" from the notice requirements of section 553(b). The court below found that the August 1, 1972 policy and the April 10, 1973 modification are within the statutory exception for general statements of policy. While the distinction between a rule as defined in section

551(4), which must be published, and a "general statement of policy," which is not defined in the Act, is enshrouded in considerable smog, we hold that the policy statements complained of were properly held to be within the "general statements of policy" exception.[5]

In the first place, the regulation governing the issue of extensions of time to depart which is here relevant explicitly provides that the "[a]uthority to extend the time within which to depart . . is within the sole jurisdiction of the district director." 8 C.F.R. § 244.2. The "instructions" complained of in this case do not purport to amend the published regulation or to oust the District Director of his "sole" discretion. In fact, the District Director of New York was the only INS officer who "routinely" extended the stay in the case of an alien married to a resident alien; the practice in the rest of the country was otherwise. We construe the instruction to be simply a statement by the agency of its general policy as a guideline for the District Directors. A distinctive characteristic of the general policy statement was indicated by Judge Friendly when he stated in his Holmes Lectures that "one of the values of the policy statement [is] the *education of agency members in the agency's work*." H. Friendly, The Federal Administrative Agencies 145–46 (1962) (emphasis added). One scholar has suggested that "[i]t may be that

'general statements of policy' are rules directed primarily at the staff of an agency describing how it will conduct agency discretionary functions, while other rules are directed primarily at the public in an effort to impose obligations on them." Bonfield, Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy under the APA, 23 Admin.L.Rev. 101, 115 (1970–71). See also Parker, The A.P.A.: A Study in Overestimation, 60 Yale L.J. 581, 598 (1951).[6]

The same thought is expressed in the so-called "substantial impact" test, which places within the rulemaking procedure only those rules which have "a substantial impact on those regulated," Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3d Cir. 1969), that is, ordinarily rules that change "existing rights and obligations," Lewis-Mota v. Secretary of Labor, 469 F.2d 478, 482 (2d Cir. 1972).[7] We cannot conclude that the instructions at issue here changed the existing right of the appellants to have their applications for extensions of time to depart authorized in the sole discretion of the district director. As noted below, the appellants may still be entitled under the regulations to deferred voluntary departure on the basis of hardship.

The INS policy under attack here, considered according to the appropriate

5. Appellants relied in their brief upon a decision by Judge Motley granting a motion for a preliminary injunction in Felipe Demaren v. Attorney General, 73 Civ. 1079 (S.D.N.Y. 1973). In that case, the plaintiff sought injunctive relief against denial of a stay of deportation pursuant to a policy similar to the one before us, and the court held that the policy ought to have been published pursuant to 5 U.S.C. § 553(b). However, subsequent to the filing of briefs in the case before us, Judge Motley vacated the preliminary injunction in *Demaren*, denied a motion for a permanent injunction and dismissed .the complaint, concluding on further consideration that there was no requirement that the policy at issue be published pursuant to section 553(b).

6. See T.S.C. Motor Freight Lines, Inc. v. United States, 186 F.Supp. 777, 786 (S.D.Tex. 1960) (three-judge court), aff'd *per curiam*, 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed.2d 387 (1961) (regulation governing internal management of an agency need not be published because it was not designed for the guidance of the public).

7. See also Nader v. Butterfield, 373 F.Supp. 1175, 1178 (D.D.C.1974); Continental Oil Co. v. Burns, 317 F.Supp. 194, 197 (D.Del.1970); Pharmaceutical Mfgrs. Ass'n v. Finch, 307 F.Supp. 858, 863 (D.Del.1970); National Motor Freight Traffic Ass'n v. United States, 268 F.Supp. 90, 96 (D.D.C.1967) (three-judge court), aff'd *per curiam*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968); Seaboard World Airlines, Inc. v. Gronouski, 230 F.Supp. 44, 46 (D.D.C.1964).

equal protection standard, does not violate the fifth amendment, and there was clearly no abuse of administrative discretion. Since the policy was a general statement of policy rather than a rule, there was no violation of the publication requirement of the APA. We conclude, therefore, that the decision below must be affirmed.

Affirmed.