UNITED STATES of America ex rel. Jose PARCO and Luzviminda Parco, his wife

v.

Raymond A. MORRIS, District Director, Immigration and Naturalization Service.

Civ. A. No. 73–2496.

United States District Court, E. D. Pennsylvania.

Jan. 28, 1977.

James J. Orlow, Philadelphia, Pa., for plaintiff.

Walter S. Batty, Jr., Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

 Jose and Luzviminda Parco, husband and wife, are citizens of the Philippines who have resided as aliens in the United States since 1970. After a joint deportation hearing, an immigration judge found that each was deportable under 8 U.S.C. § 1251(a)(2) as one who has overstayed a non-immigrant visa, but granted each of the Parcos the privilege of voluntary departure in lieu of deportation.[1] The deadline for voluntary departure was set for June 30, 1973, but on June 25, the Parcos applied to the district director of the Immigration and Naturalization Service (predecessor of the respondent) for an indefinite extension of this date,[2] and they did not depart. On September 21, 1973, their extension applications were denied and final orders of deportation issued. On October 18, 1973, the district director of the Immigration and Naturalization Service (INS) denied applications for stay of deportation,[3] whereupon the Parcos commenced this action for a writ of habeas corpus pursuant to 8 U.S.C. § 1105a(a)(9) and 28 U.S.C. § 2241(c)(1) and (3),[4] attacking the denial of their applications for extended voluntary departure.

The Parcos assert (and the government concedes) that their applications for extended voluntary departure would have been granted when filed had not the INS recently changed the bases on which district directors were authorized to grant such applications. They contend (and this the government sharply disputes) that the district director's denial of their extended voluntary departure application was unlawful, because the policy change on which the denial depended was implemented without the advance, public notice required by law, and they therefore missed by some thirty days their opportunity to receive the benefit of the prior, favorable policy. Second, they argue that an agency policy of such long-standing as the one at issue may not, as a matter of administrative law, be changed without adequate reasons. They claim that the reversal of agency policy which left them ineligible for extended vol-

---

**1.** *See* 8 U.S.C. § 1254(e); 8 C.F.R. § 244.1 (1976). A deportable alien granted voluntary departure is expected to leave the country at his or her own expense. Unlike deportation, a prior voluntary departure does not bar later re-entry into the United States. *See* 8 U.S.C. § 1182(a)(17).

**2.** *See* 8 C.F.R. § 244.2 (1976).

**3.** *See* 8 C.F.R. § 243.4 (1976).

**4.** The Parcos do not challenge their final order of deportation on its merits, but only the district director's subsequent denial of their collateral applications for discretionary relief. Thus, the otherwise exclusive procedures for administrative review of final orders of deportation set out in 8 U.S.C. § 1105a(a)(1) through (8) do not apply. *INS v. Stanisic,* 395 U.S. 62, 68 n.6, 89 S.Ct. 1519, 23 L.Ed.2d 101 (1969); *Cheng Fan Kwok v. INS,* 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968). Habeas corpus is an appropriate procedure to review the denial of discretionary relief from deportation where de-

portability itself is not in issue. *See Foti v. INS,* 375 U.S. 217, 231 & n.19, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Where an order of deportation is outstanding, the "custody" requirement for habeas corpus jurisdiction is satisfied. *See* 8 U.S.C. § 1252(d); *United States ex rel. Marcello v. District Director of INS,* Civil No. 76–957 (E.D.La., June 11, 1976); *Varga v. Rosenberg,* 237 F.Supp. 282 (S.D.Cal. 1964). *See generally* "Developments in the Law—Federal Habeas Corpus," 83 Harv.L.Rev. 1038, 1238–59 (1970). As a district court, we would also have jurisdiction to review the denial of such applications in an action for injunctive or declaratory relief pursuant to 8 U.S.C. § 1329, although such equitable relief is not sought in this case. *See, e. g., Kimm v. Rosenberg,* 363 U.S. 405, 80 S.Ct. 1139, 4 L.Ed.2d 1299 (1960).

untary departure was not so supported. Finally, the Parcos contend that the policy change resulted from improper Congressional pressure on the INS, in violation of principles of administrative law and the doctrine of Constitutional separation of powers. The government replies that the policy change in issue here was legally exempt from the requirement of prepublication; that the agency's reasons for the change of position were adequate; and that the alleged Congressional prompting does not invalidate the new rule.

■ This case does not involve a garden variety application for stay of deportation or application for extended voluntary departure issue. The legal posture of this case is radically affected by the government's factual concession that:

> The request for extended voluntary departure of [Mrs. Parco] was denied solely because of the general change in the program of the Immigration and Naturalization Service of July 1972 not to grant extended voluntary departure for beneficiaries of approved Third Preference Petitions filed after July 31, 1972.[5]

Pretrial Order, Stipulation 15 (Dock No. 22, filed Feb. 13, 1976); Stipulation of Fact, ¶ 4 (Dock No. 23, filed Feb. 13, 1976). Because it is agreed that the respondent did not exercise independent discretion on the facts of this case, but rather purported to follow a legal rule, our review concerns the validity of the rule and is plenary, rather than strictly limited as it would otherwise be. *Hou Ching Chow v. Attorney General,* 362 F.Supp. 1288, 1290 (D.D.C.1973); *see Wong Wing Hang v. INS,* 360 F.2d 715, 718 (2d Cir. 1966). *Compare* 5 U.S.C. § 706(2)(B),

(C), (D) (review of legal questions), *with id.* § 706(2)(A); *Spata v. INS,* 442 F.2d 1013 (2d Cir.), *cert. denied,* 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99 (1971); *Discaya v. INS,* 339 F.Supp. 1034 (N.D.Ill.1972) (INS discretion to deny extended voluntary departure to beneficiaries of approved preference petitions will not be overturned absent clear abuse proved on the facts, even though general policy is to grant it.). We therefore treat this case as presenting almost pure questions of law. On that level, we reject the Parcos' Congressional interference argument and find their lack-of-rational-basis claim unpersuasive in this case. The Parcos' first claim, however, respecting the legal inadequacy of notice of the impending change of rule is, we believe, meritorious. Accordingly, we will grant the writ of habeas corpus and order appropriate relief.

## II. The Legal and Factual Background

### A. Third Preference Aliens and Extended Voluntary Departure

To understand the Parcos claims in any detail, they must be put in a setting of immigration law, illuminated by an explication of certain peculiar (background) facts of this case. In any given year, a quota of 170,000 natives of the Eastern Hemisphere, including Filipinos, may receive visas to enter the United States as immigrants for permanent residence. 8 U.S.C. § 1151(a). Of these, up to 17,000 of the visas are reserved for holders of approved Third Preference petitions: alien professionals and those with exceptional ability in the sciences or arts. These professionals, scientists and artists are known as "PSA" aliens. 8 U.S.C. § 1153(a)(3).[6] Of the 170,000, no

---

5. The system of visa preferences is explained in footnote 6 *infra.*

6. The 170,000 visas for Eastern Hemisphere natives per year are issued to aliens who have filed petitions for them under a system of "preferences." First, up to 20% (if that many petitions are pending) go to unmarried children of American citizens. 8 U.S.C. § 1153(a)(1). Second preference, also up to 20%, is for spouses and unmarried children of resident aliens. *Id.* § 1153(a)(2). Third, called "PSA," is the provision involved here. Under this "Third Preference," up to the next 10% of

visas are allocated to members of the professions and those with "exceptional ability in the sciences or the arts." *Id.* § 1153(a)(3). Next come (4) married children of citizens; (5) siblings of citizens; (6) those capable of performing nonseasonal labor for which a shortage of workers exists in the United States; and (7) certain refugees. *Id.* § 1153(a)(4)–(7). Aliens who do not fall into these categories may receive only such visas as are left over in any given year. *Id.* § 1153(a)(8), (b), (d). Third and Sixth preference visas are not issued until the Secretary of Labor certifies under 8 U.S.C.

more than 20,000 visas in any given year may go to Filipinos. *Id.* § 1152(a). In recent years, demand for visas by Filipinos has vastly exceeded the supply. Thus, the Visa Office in the Department of State, which maintains records and publishes a bulletin on visa availability, shows approximately a six year waiting period before a visa can be issued to a Filipino who files a Third Preference petition.[6a]

Under an INS policy in effect at least from July, 1956, until July 31, 1972, a nonimmigrant, physically present in the United States, who was subject to deportation but who filed a satisfactory Third Preference visa petition, was eligible for "extended voluntary departure." INS Operating Instruc-

tion (OI) 242.10(a)(6)(i).[7] This meant, in effect, that no firm date to leave the United States was set, and the alien could await the availability of a visa while remaining in this country. When the visa became available, the alien could then apply for an adjustment of status to that of permanent resident alien. 8 U.S.C. § 1255. Deportation, or even departure from the United States, was thus entirely avoided.

This INS policy was terminated in July, 1972. On July 17, the Associate Commissioner of INS for Operations, James F. Greene, circulated a memorandum to all district directors announcing the rescission of OI 242.10(a)(6) (*see* note 7 *supra*) effective July 31, 1972.[8] The effect of the mem-

---

§ 1182(a)(14) that there will be no adverse impact on the American citizen labor economy. *Id.* § 1153(a)(8). An alien spouse or child is entitled derivatively to the same preference as his or her spouse or parent if "accompanying, or following to join" him or her. *Id.* § 1153(a)(9).

By Act of Oct. 20, 1976, Pub.L. 94–571, 90 Stat. 2703, Congress significantly amended the Immigration and Nationality Act. Most of the amendments serve to equalize the status of Western and Eastern Hemisphere immigrants. One provision adds a further requirement to the Third Preference that the services of the PSA alien be "sought by an employer in the United States." Act of Oct. 20, 1976, § 4(2). The amendments are effective Jan. 1, 1977. *Id.* § 10. The 1976 amendments do not affect this case.

**6a.** One purpose of the 1976 amendments (*see* note 6 *supra*) is to shorten this wait. The preference system will be applied separately to each country that is over-subscribed, as well as to the hemisphere quota overall. Therefore Filipino petitioners with lower preferences will move up the waiting list more quickly beginning in 1977. 8 U.S.C. § 1152(e), as amended, Oct. 20, 1976, Pub.L. 94–571, § 3(3).

**7.** In pertinent part, the Operating Instruction read:

242.10 *Voluntary departure prior to commencement of hearing.* (a) *Authorization.* Voluntary departure may be granted to any alien who is statutorily eligible therefor . . . (6)(i) who is the beneficiary of an approved third preference petition . . . or (8) in whose case the district director has determined there are compelling factors warranting grant of voluntary departure.

**8.** According to the memorandum:

[U]nlawful employment of nonresident aliens in the United States has been having an increasingly unfavorable effect on the domestic job market. . . . Subcommittee No. 1 of the House of Representatives Committee on the Judiciary . . . has . . . recommended to the Service that the practice be terminated of routinely permitting alien professional . . . to remain in the United States pending the availability of immigrant visas.

The Service has accepted the Subcommittee's recommendations. Accordingly, OI 242.-10(a)(6) is terminated effective July 31, 1972, except for the following:

. . . . .

2. A "PSA" [professional, scientist, or artist] alien in the United States on July 31, 1972, for whom an approved third or sixth preference petition was filed on or before that date.

. . . . .

. . . Nothing in this memorandum is intended to affect the grant of voluntary departure to any alien eligible for that privilege on other grounds . . .
. . . [U]nder OI 242.10(a)(8) . . . [a] careful review is to be made of each case presented to determine whether or not compelling factors are present.

\* \* \* \* \* \*

The aspects of the memorandum omitted in the preceding excerpt refer to OI 242.10(a)(6)(ii), also rescinded effective July 31, 1972, which announced a similar policy of extended voluntary departure, but with respect to certain Western Hemisphere aliens, a provision not involved in this case. *See Noel v. Chapman,* 508 F.2d 1023 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), discussed in Part III.C. *infra.*

orandum was to remove the discretion of district directors to extend indefinitely the voluntary departure of third preference petitioners on that basis; the privilege was only to be granted in "compelling" cases. *See* OI 242.10(a)(8), *supra* note 7. An exception was provided, however, for those whose preference petitions were filed prior to July 31, 1972.

Mrs. Parco filed her petition for Third Preference status on September 8, 1972, and it was ultimately approved.[9] Because of the rescission of OI 242.10(a)(6)(i), however, this petition came too late by just over one month to achieve extended voluntary departure. As noted above, it is undisputed here that the Parcos could have remained in the country indefinitely awaiting the availability of visas if the petition had been filed before July 31. Instead, they faced the prospect of returning to the Philippines for approximately six years, until Mrs. Parco's immigrant visa becomes available.

### B. The Parcos

Luzviminda Parco entered the United States on September 10, 1970, as a student. Her status was subsequently changed to that of an exchange visitor. Her husband Jose Parco accompanied her. She completed her education at the University of Pennsylvania in May, 1972, receiving a Masters Degree in Social Work (M.S.W.). Mrs. Parco has been employed for some time as a Mental Retardation Coordinator at the Pottstown (Pa.) Mental Health Mental Retardation Center. Her duties include coordination of all services for the mentally retarded, arrangements for diagnostic studies, counseling, training, and community relations.

Jose Parco is the owner of a television and radio repair service business in partner-ship with a United States citizen whom he trained. They employ another American citizen.

### III. Discussion

### A. Was the Rescission of the INS Extended Voluntary Departure Operating Instruction Invalidated by Improper Congressional Influence in Violation of the Doctrine of Separation of Powers?

■■ The Parcos contend that the administrative decision to rescind OI 242.-10(a)(6) is invalid because it was motivated by the direct pressure of Congressman Peter Rodino, now chairman of the House Judiciary Committee and then chairman of the subcommittee responsible for oversight of the administration of the immigration laws. There is no doubt that the recommendation of Congressman Rodino was the direct impetus for the change in policy, for the memorandum announcing the change says so in its first paragraph. *See* note 8 *supra*. Moreover, in the hearing before us, Leon Rosen, Esquire, then president of the Association of Immigration and Nationality Lawyers, testified that then Commissioner Raymond Farrell of INS told him at the time that Chairman Rodino had accused him (Farrell) of circumventing Congressional intent by using the extended voluntary departure device to permit deportable aliens to remain in the United States when they had no actual intention of ever departing voluntarily. Rosen said that Farrell acknowledged he felt "forced" to change the rule. We credit this testimony, which is also corroborated by the written record.

The doctrine of separation of powers was explained in *Kwai Chiu Yuen v. Immigration and Naturalization Service,* 406 F.2d 499, 500–01 (9th Cir. 1969), *cert. denied,* 395

---

9. The approval took some time. A prerequisite to approval of a Third Preference petition is the granting of a labor certification under 8 U.S.C. § 1182(a)(14). *See* 8 U.S.C. § 1153(a)(8). The Regional Manpower Administration of the Department of Labor initially denied the application for labor certification, a decision upheld by the Secretary on review, but the labor certification was finally granted on August 23, 1974, following our decision in *Parco v. Whitsitt,* Civ. No. 73–1529 (E.D.Pa., May 8, 1974). On account of the initial denial of labor certification, the preference petition had been disapproved, but after the certification was granted, the Third Preference petition was approved on October 9, 1974, with a priority date on the waiting list for visas as of September 8, 1972. Exhibit P–2.

U.S. 908, 89 S.Ct. 1750, 23 L.Ed.2d 221 (1969), as follows:

> The doctrine of separation of powers is not clearly stated in the Constitution, but has been deemed to flow naturally from the division of the federal government into three branches, each given enumerated powers. It is clearly a concept which operates as a constitutional limitation as between the branches of the federal government. See *Kilbourn v. Thompson,* 103 U.S. 168, 190, 29 L.Ed. 377; *Springer v. Government of Philippine Islands,* 277 U.S. 189, 201, 48 S.Ct. 480, 72 L.Ed. 845.

However, we see no Constitutional violation in a Congressional attempt to influence the regulatory interpretation of statutes. Interrogation of agency officials at Congressional hearings often serves such a purpose and is part of the give and take of democratic government. We think that the contention the Parcos seek to raise is really one of administrative law, *i. e.,* that an agency decision may be invalid if induced by secret or otherwise improper influence.

Moreover, the reasons cogently explicated by Chief Judge Bazelon in *D.C. Federation of Civic Ass'ns v. Volpe,* 148 U.S.App.D.C. 207, 459 F.2d 1231, 1245–49 (1971) (alternate holding), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972), also defeat the Parcos' argument in this case. The *D.C. Federation* case concerned an attempt (ultimately successful) to block construction of the Three Sisters Bridge into Washington, D.C., through George Washington Memorial Park. The court held that the public and enforceable threat of a certain Congressman that he would block funds for the District of Columbia subway unless the Secretary of Transportation authorized construction of the bridge invalidated the Secretary's decision to build it, which was admittedly based in part on the pressure.

However, Judge Bazelon's analysis of this principle distinguishes sharply between agency action which is "judicial" or "quasi-judicial" and agency action which is "legislative." The former concept relates to agency adjudication of a particular, individual case, or when it renders a decision on the record compiled in formal hearings; in such instance the consideration of extraneous pressuring influences undermines the fairness of the hearing accorded the adverse parties. *Id.* at 1246; *accord, Pillsbury Co. v. FTC,* 354 F.2d 952, 964 (5th Cir. 1966); *Texas Medical Ass'n v. Mathews,* 408 F.Supp. 303 (W.D.Tex.1976); *Koniag, Inc. v. Kleppe,* 405 F.Supp. 1360, 1371–73 (D.D.C.1975) (Gesell, J.). On the other hand, when the agency action is purely "legislative," as in the informal rulemaking involved here, the decision "cannot be invalidated merely because the . . . action was motivated by impermissible considerations" any more than can that of a legislature. *D.C. Federation, supra,* 459 F.2d at 1247; *cf. Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 129–31, 3 L.Ed. 162 (1810). The Parcos do not contend that Congressman Rodino or anyone else improperly interfered with the "quasi-judicial" decision to deny *them* extended voluntary departure. Rather, they seek to challenge the motivation of the administrator in taking the purely "legislative" action of rescinding OI 242.-10(a)(6). This they cannot successfully do.

## B. *Was the Rescission of the Operating Instruction Based on Sufficient Reasons?*

█ The Parcos argue that an agency policy of some twenty years' standing such as OI 242.10(a)(6) may not be rescinded or changed without good and sufficient reason. The government counters that we should strike down the decision to change the rule only if the decision lacks any rational basis.[10]

---

10. The Parcos cite such cases as *Duquesne Light Co. v. EPA,* 522 F.2d 1186, 1193 (3d Cir. 1975); *Consolidated Gas Supply Corp. v. FPC,* 172 U.S.App.D.C. 162, 520 F.2d 1176, 1187 (1975); *Maine v. CAB,* 520 F.2d 1240, 1245 (1st Cir. 1975); and *Oil Shale Corp. v. Morton,* 370 F.Supp. 108, 123 (D.Colo.1973). All are readily distinguishable, since they deal with the standard of review either of rules announced and applied in the adjudication of individual cases, or of formal rulemaking on the record. *See* 5 U.S.C. §§ 553(c), 554. None deals with "notice and comment" rulemaking, the most formal provision arguably applicable here. *See gener-*

■ The Parcos rely heavily on the introductory sentence of the July 17, 1972, memorandum, which declares "that unlawful employment of nonresident aliens . . has been having an increasingly adverse effect on the domestic job market." *See* note 8 *supra*. The memorandum articulates no other basis for the decision to stop granting indefinite extensions of voluntary departure to Third Preference aliens and their immediate families. The Parcos claim that as applied to holders of approved Third Preference petitions, such as themselves, this rationale is completely lacking in logic. By definition, this argument goes, every such alien is the beneficiary of a labor certification. 8 U.S.C. § 1153(a)(8); *see* note 6 *supra*. If the Secretary of Labor has declared that no alien in that category will by his or her employment adversely affect the American citizen labor economy, which is how the labor certification reads, then surely, the Parcos conclude, the category taken as a whole will have no adverse impact.

The conclusion does not entirely follow from the premise, however, because alien spouses become preference beneficiaries derivatively, without any requirement of a labor certificate of their own. 8 U.S.C. § 1153(a)(9). While Mr. Parco's employment in this case is having no adverse im-

pact on the economy (*see* Part II.B. *supra*), this is not necessarily true of spouses in this category generally. Moreover, the affidavit of Sam Bernsen, Esquire, former Assistant Commissioner for Adjudications and now General Counsel of INS, gives several different reasons for the policy change as he recommended it. Bernsen cited (1) an increasing abuse of the voluntary departure privilege, (2) unfairness of the prior policy given the increasing numbers of aliens outside the United States awaiting the availability of visas under Congressionally declared quotas, and (3) a perceived resultant adverse effect on the administration of the immigration laws.[11] We cannot say these latter claims do not support the policy change.[12] For, even where there has been a longstanding policy to the contrary, and even where their continued residence in the United States will not aggravate the unemployment of citizens, we cannot say that a requirement that aliens who have no statutory or other right to remain here must leave and await the issuance of immigrant visas under lawful quotas from their homes in their native countries, lacks rationality or offends some other standard of limited review (see n.10 *supra*). Indeed, even under the "good and sufficient reason" test proposed by the Parcos, the policy change passes muster, hence this aspect of their argument must fail.

*ally* K. Davis, Administrative Law Treatise § 6.15 (1970 Supp.); Note, Judicial Review of the Facts in Informal Rulemaking, 84 Yale L.J. 1750 (1975). The case cited by respondent, *Wong Wing Hang v. INS,* 360 F.2d 715 (2d Cir. 1966), is inapposite for the same reason. What is plain is that substantive judicial review of executive rules reflecting the essentially political policy about which aliens may enter and stay in the United States is very narrow. *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 1904–05 n.21, 48 L.Ed.2d 495 (1976). This rule of limited review is especially applicable to this case, we think, where the question presented is how long a *concededly deportable* alien may remain in this country *after* being ordered deported. *Cf. Sam Andrews' Sons v. Mitchell,* 457 F.2d 745, 748 (9th Cir. 1972) (INS regulations to be upheld if founded "on considerations rationally related to the statute . . . .").

**11.** In his deposition former Associate (now Deputy) Commissioner of INS James F. Greene, who signed the memorandum implementing the change, although testifying initially that he knew of no reason behind the change other than that stated in his memorandum (Dep. at 7), then reversed that claim by stating *that he agreed completely with Bernsen's* affidavit (Dep. at 8–9). This discrepancy was not resolved. Neither side presented an affidavit or took the deposition of former Commissioner Farrell, who made the decision in issue.

**12.** In rescinding Operating Instruction 242.-10(a)(6) the INS did not follow a formal rule-promulgating procedure. In the following section of this Opinion we hold this failure unlawful. But in the absence of their having followed such a procedure, we will not artificially limit our consideration of administrative rationales to that articulated in the particular memorandum effecting the change.

C. *Was INS Required to Publish the Regulatory Change, and, if so, Are the Parcos Bound by the Unpublished Rule?*

 Neither Operating Instruction (OI) 242.10(a)(6)(i), announcing the availability to third preference petitioners of extended voluntary departure status, nor the 1972 memorandum rescinding the OI was ever published in the Federal Register. Absent such publication, the relators here claim that the change in the rule is invalid and that they may not be adversely affected by the OI's rescission. They rely on 5 U.S.C. § 553 [13] and certain cases. The respondent counters that the OI is not a "rule" but, a "general statement of policy" which is exempted from rulemaking under 5 U.S.C. § 553(b).[14] The respondent relies on *Noel v. Chapman,* 508 F.2d 1023 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975).

In *Noel,* the Second Circuit rejected the same argument advanced by the relators here as applied to a different aspect of the same OI rescinded by the same July 1972 memorandum. 508 F.2d at 1029–30. From 1968 to 1972, in the New York District, INS routinely granted extended voluntary departure to Western Hemisphere aliens married to permanent resident aliens. The discretion to grant the privilege on that basis was removed on July 31, 1972. *Id.* at 1025. The *Noel* Court stated that "general statements of policy" are generally said to be those " 'directed primarily at the staff of an agency describing how it will conduct agency discretionary functions,' " *id.,* and noted

that the decision whether to extend a grant of voluntary departure in a given case rests in the discretion of the District Director. 8 C.F.R. § 244.2. Taking a phrase from *Texaco, Inc. v. FPC,* 412 F.2d 740, 744 (3d Cir. 1969), the Court held that the rescission of OI 242.10(a)(6) did not have a "substantial impact" on the affected aliens because they were entitled to no more than an exercise of discretion in the first place and might still be eligible for extended voluntary departure after the change on the basis of "compelling" hardship. *See* notes 7 and 8 *supra.* The *Noel* opinion itself recognized, however, that the definition of "general statement of policy" is "enshrouded in considerable smog." 508 F.2d at 1030.

Because of certain differences between *Noel* and this case, we will not follow it here. First, the government stipulated on behalf of the Philadelphia INS director that the precipitous rescission of the OI was the sole reason for the denial of the Parcos' extension of voluntary departure. *See* text at note 5 *supra.* It is clear from the stipulation that no exercise of discretion was involved. The term "discretion" is stripped of all meaning when one contends that under a certain regulation "discretion" was exercised favorably in *all* cases of a certain kind and then, after repeal of the regulation, unfavorably in each such case. That is not "discretion." This OI does not, for example, tell district directors what factors to look for in making their decisions about a criterion such as hardship; it is in reality a flat rule of eligibility. Thus the *Noel* Court's definition of "general statement of policy" is inapplicable here, for what is at

---

13. 5 U.S.C. § 553 provides in part:

 (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto . . . have actual notice thereof in accordance with law. . . .

 (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. . . .

 (d) The required publication or service of a substantive rule shall be made not less than 30 days before its effect date . . .

14. The exceptions to 5 U.S.C. § 553 read in part:

 (b) . . . [T]his subsection does not apply—

 (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice . . .

 . . . . .

 (d) [Thirty days' notice is required], except—

 . . . . .

 (2) interpretative rules and statements of policy . . . . .

issue is not a declaration as to how to conduct "agency discretionary functions."

In addition, we are bound by the Third Circuit's decision in *Texaco, supra.* There, the Federal Power Commission had promulgated unilaterally an amendment to a published regulation, requiring, for the first time, that compound interest be paid on all sums the Commission ordered refunded by natural gas companies to consumers. The Commission previously had discretion to order the payment of interest on a case by case basis. The Court held the FPC order was not a "general statement of policy" because it had a "substantial impact" on those regulated and because it "adopts a substantive rule imposing . . . rights and obligations which an [affected person] has the burden of proving should not apply in any waiver or similar proceeding." 412 F.2d at 744. Nor was the order simply a guide to the exercise of discretion because under the prior rule the agency could have exercised its discretion to impose a payment of interest in any given case. The agency:

> elected to proceed . . . by making a general rule and, when engaged in rulemaking, it must comply with the procedural requirements imposed on rule-making by the Administrative Procedure Act, which it failed to do.

**15.** In *Lewis-Mota* the Second Circuit invalidated the Secretary's unilateral suspension of the list of occupations for which no specific job offer needed to be shown before a labor certification would issue to an alien. The fact of the suspension was published, but not until nearly a year *after* its effective date. In *Hou Ching Chow,* Judge Robinson declared invalid for lack of notice the unilateral rescission by INS of the "student exemption" to the labor certification requirement. The rescission was published in the Federal Register on its effective date, but not before.

**16.** Upon issuing the July 17, 1972, memorandum and before its effective date of July 31, the INS informed the leadership of the Association of Immigration and Nationality Lawyers, the American Council of Voluntary Agencies for Foreign Service, Inc., and the National Association for Foreign Student Affairs of the OI change. The respondent here does not attempt to contend that this informal and last-minute

*Id.* at 745 (footnote omitted). See also *Pickus v. United States Board,* 165 U.S.App. D.C. 284, 507 F.2d 1107, 1112–13 (1974) (Hastie, J.) (not general statement of policy if "calculated to have a substantial effect on ultimate [discretionary] decisions"); *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2d Cir. 1972); *Hou Ching Chow v. Attorney General,* 362 F.Supp. 1288 (D.D.C. 1973).[15] We think the situation here falls squarely within the category outlined in *Texaco* and therefore hold that interested persons, such as the Parcos, were entitled to advance notice and an opportunity to comment on the proposed change in the Operating Instruction through prepublication in the Federal Register.[16]

We noted at the outset of this section that neither the OI nor the memorandum rescinding it was ever published in the Federal Register. This failure is a separate ground on which to invalidate the change. Entirely separate from the prepublication requirement imposed in some cases by 5 U.S.C. § 553 (*see* notes 13–14 *supra*) is the simple *publication* requirement of § 552(a), the Freedom of Information Act.[17] See *Ramer v. Saxbe,* 173 U.S.App.D.C. 83, 522 F.2d 695, 705 (1975) (MacKinnon, J., concurring). As the Supreme Court recently put it, this provision was intended "to avoid the inherently arbitrary nature of unpublished

procedure satisfied the notice requirement of the law.

**17.** In part, 5 U.S.C. § 552(a)(1) provides:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

. . . . .

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.

*See also* 44 U.S.C. § 1505(a)(3) (Federal Register Act).

*ad hoc* determinations." *Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974). The repeal of OI 242.-10(a)(6) is characterized by the respondent here as a "general statement of policy." Under § 552 the repeal of a "statement of general policy" must be published; [18] if not published, a person without notice cannot be adversely affected. This policy change was not published as required by law. For this reason as well, the Parcos cannot be bound by it.

## IV. *The Appropriate Remedy*

 The classical form of relief under habeas corpus for a prisoner whose liberty has been restrained through a procedurally invalid decision is to declare that the writ will issue unless within some fixed period the government makes the questioned decision anew under valid procedures. Sokol, Federal Habeas Corpus § 9.5, at 95–96 (1969); *see, e. g., Grasso v. Norton,* 371 F.Supp. 171, 175 (D.Conn.1974), *modified on other grounds,* 520 F.2d 27 (2d Cir. 1975). However, 28 U.S.C. § 2243 authorizes us to "dispose of the matter as law and justice require." See *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). In this case, it would be a waste of administrative time and an unnecessary prolongation of the Parcos' patient vigil to remand this case to the District Director to rule anew on the application for extended voluntary departure. As we have reiterated above, the Director stipulated here that were it not for the July 1972 memorandum which we have held invalid under the APA he would have granted the application. In addition, 5 U.S.C. § 552 guarantees that the Parcos may not "be adversely affected by" the unpublished repeal of OI 242.10(a)(6). For these reasons, we think the appropriate relief is an order declaring that the relators are entitled to remain in the United States, notwithstanding their final orders of depor-

tation, as if under an administrative order authorizing extended voluntary departure.

---

**18.** Whether a "general statement of policy" under § 553 is the same as a "statement of general policy" under § 552 is an intriguing mystery which no case seems to help solve. Nor does Professor Davis seem to discuss the problem. *See* K. Davis, Administrative Law of the Seventies §§ 3A.7, 5.03, at 72–75, 146–61 (1976). We assume there is no material difference between the two terms, if indeed Congress intended any difference at all.