**GROCERY MANUFACTURERS OF AMERICA, INC., a Delaware Corporation, Plaintiff,**

v.

**Joseph GERACE, Commissioner, New York Department of Agriculture and Markets, and the New York Department of Agriculture and Markets, Defendants,**

**John R. Block, Secretary of Agriculture of the United States and the Department of Agriculture of the United States, Margaret M. Heckler, Secretary of Health and Human Services of the United States and the Department of Health and Human Services of the United States, Additional Defendants on Counterclaim.**

**No. 83 Civ. 8629 (HFW).**

United States District Court, S.D. New York.

March 8, 1984.

---

Kaye, Scholer, Fierman, Hays & Handler by Sheldon Oliensis, Thomas Smart, New York City, Burditt & Calkins by George M. Burditt, Richard E. Favoriti, Margaret A. Kathrein, Deborah B. Norton, Chicago, Ill., for plaintiff.

New York Department of Agriculture and Markets by Thomas G. Conway, Joan A. Kehoe, Richard P. Feirstein, Albany, Robert Abrams, Atty. Gen. of the State of N.Y. by Melvin R. Leventhal, Daniel D. Kaplan, Asst. Attys. Gen., New York City, for defendants.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by R. Nicholas Gimbel, Asst. U.S. Atty., New York City, Thomas Scarlett, Frederick H. Degnan, U.S. Food and Drug Administration, Elizabeth Ann Peterson, U.S. Dept. of Agriculture, Washington, D.C., for F.D.A. and U.S.D.A.

## MEMORANDUM DECISION

KEVIN THOMAS DUFFY, District Judge.

Plaintiff Grocery Manufacturers of America ("GMA") has filed a complaint seeking injunctive and declaratory relief against the New York State Department of Agriculture and Markets ("Department") and Joseph Gerace, Commissioner the ("Commissioner") of the Department.[1] GMA claims, *inter alia*, that existing federal statutes and regulations governing the labeling of imitation foods including the labeling of imitation cheese products preempts a recently enacted New York statute, N.Y.Agric. & Mkts. Law § 63

---

1. The United States Department of Agriculture and the United States Food and Drug Administration have responded as additional defendants on the Commissioner's counterclaim.

(McKinney Supp.1983), and its implementing regulations, 1 NYCRR Part 18. The federal regulations require only that nutritionally inferior products be labeled imitation. The New York statute, on the other hand, requires that all products that resemble or are intended to substitute for traditional or standardized cheese products—whether nutritionally inferior, superior, or equivalent—be labeled imitation.

GMA claims that this alleged intrusion into a federally regulated field violates the Due Process, Commerce, Equal Protection and Supremacy Clauses of the United States Constitution and the Due Process and Equal Protection Clauses of the New York Constitution. Plaintiff also seeks relief under 42 U.S.C. § 1983 and requests attorneys fees. The matter is presently before me on plaintiff's motion for a preliminary injunction. The parties agree and I find that there are no unresolved material issues of fact. Summary judgment as to plaintiff's motion for a preliminary and permanent injunction is therefore appropriate. *See* Fed.R.Civ.P. 56. To evaluate plaintiff's arguments, I turn first to an in depth description of the relevant statutes and regulations.

## BACKGROUND

The labeling of all food products shipped in interstate commerce is regulated generally by the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.,* and its implementing regulations promulgated by the FDA. 21 C.F.R. § Part 100, *et seq.* The Act requires that the label of a food bear its "common or usual name ... if any there be," 21 U.S.C. § 343(i), and

prohibits the sale of a food under the name of another food. 21 U.S.C. § 343(b). The FDCA further provides that a food which is an imitation of another food product is misbranded "unless the label bears, in type of uniform size and prominence, the word 'imitation' and, immediately thereafter, the name of the food imitated." 21 U.S.C. § 343(c). The statute, however, does not define the word "imitation." In 1973, the Food and Drug Administration ("FDA") promulgated regulations defining imitation food as food which "is a substitute for and resembles another food but is nutritionally inferior to that food." 21 C.F.R. § 101.-3(e).[2] The regulations also provide that a substitute food that is not nutritionally inferior must be identified by an appropriate common or usual name or, if none exists, a descriptive term. *See* 21 C.F.R. §§ 102.1(a) & (b); 21 C.F.R. § 1.17. Violators of the FDCA are subject to both civil and criminal sanctions. 21 U.S.C. §§ 332–34. Unlike its counterparts in meat, poultry and packaging, the FDCA contains no express preemption provision.[3]

The production and labeling of all meat and poultry food products shipped in interstate commerce is regulated by the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601, *et seq.,* the Federal Poultry Products Inspection Act ("PPIA"), 21 U.S.C. § 451 *et seq.,* and their respective implementing regulations, 9 C.F.R. § 317, *et seq.* Both the FMIA and the PPIA are administered by the United States Department of Agriculture ("USDA") which has the authority to approve all labels for meat and poultry food products prior to their shipment in

---

**2.** Nutritionally inferior is defined in 21 C.F.R. § 101.3(e)(4) as:
(i) Any reduction in the content of an essential nutrient that is present in a measurable amount, but does not include a reduction in the caloric or fat content ... (ii) For the purpose of this section, a measurable amount of an essential nutrient in a food shall be considered to be 2 percent or more of the U.S. RDA of protein of any vitamin or mineral listed under § 105.3(b) of this chapter per average usual serving, or where the food is customarily not consumed directly, per average usual portion, as established in § 101.9.

**3.** The FDA has issued its food labeling regulations under both the Fair Package and Labeling Act ("FPLA") and the FDCA. *See* 21 C.F.R. Part 101; 38 Fed.Reg. 20702 (Aug. 2, 1973). The FPLA provides labeling requirements that are similar to the misbranding provisions set forth in the FDCA. *Compare* 15 U.S.C. § 1453 *with* 21 U.S.C. § 343. While the FPLA contains an express preemption provision, 15 U.S.C. § 1460, plaintiff does not suggest that the New York regulations are preempted under that statute.

interstate commerce. 21 U.S.C. §§ 607(d)(meat) & 457(d)(poultry). The misbranding provisions of the FMIA and the PPIA are substantially identical to the FDCA provisions. *Compare* 21 U.S.C. § 343(c) *with* 21 U.S.C. §§ 453(h)(poultry) & 601(n)(meat). No formal regulation has been issued .defining "imitation" under either the FMIA or the PPIA, however, proposed rules are presently pending, 44 Fed. Reg. 75991, 76007–09 (Dec. 21, 1979), and the USDA has as a matter of policy adopted the FDA's definition of the term. *See In Re: Castleberry's Food Co.*, FMIA No. 36 at p. 10 (USDA 1981); Food Labeling: Tentative Positions of Agencies, 44 Fed.Reg. 75990 (Dec. 21, 1979); Affidavit of Robert G. Hibbert, Director of Standards and Labeling Division, Meat and Poultry Inspection Technical Service, United States Department of Agriculture sworn to on December 9, 1983 at ¶ 2–3; Affidavit of Donald Houston, Administrator of the Food Safety Inspection Service, United States Department of Agriculture sworn to on February 2, 1984 at ¶ 4. Violators of the FMIA and the PPIA are subject to both civil and criminal sanctions. 21 U.S.C. §§ 461 & 467 (poultry); 21 U.S.C. §§ 672–676 (meat). Both Acts have an express preemption provision allowing the states to exercise concurrent jurisdiction in enforcement of the Acts but prohibiting the states from imposing "[m]arking, labeling, packaging, or ingredient requirements in addition to or different than, those made under" the respective statutes. 21 U.S.C. §§ 467e & 678.[4]

Section 63 of the New York Agriculture and Markets Law was enacted on July 22, 1982, and became effective one year later.[5] The statute requires, in part, that products deemed under New York law to be imitation cheese or imitation cheese food bear the word "imitation" on their labels in letters of the same color, on a contrasting background, and of equal size as the letters of the brand name or product designation whichever is larger.[6] The statute further provides that service food establishments which offer products containing imitation cheese or imitation cheese food must (a) post a sign on the premises which states the names of the foods containing imitation cheese or imitation cheese food in block letters at least three inches in height against a contrasting background; (b) state on their menus the names of the products containing imitation cheese or imitation cheese food immediately after the product designation on the menu in letters of equal size; and (c) conspicuously label any container used by consumers which contains

4. Both preemption provisions provide in part: Marking, labeling, packaging, or ingredient requirements ... in addition to, or different than, those made under this chapter may not be imposed by any State ... with respect to articles prepared at any official establishment in accordance with the requirements under this chapter, but any State ... may, consistent with the requirements under this chapter exercise concurrent jurisdiction with the Secretary ... for the purpose of preventing the distribution of ... any such articles which are adulterated or misbranded .... This chapter shall not preclude any State ... from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.

5. A 1983 amendment changed the size of the required labels from one third the size of the brand name to letters of equal size. N.Y.Agric. & Mkts Law § 63 (McKinneys Supp.1983) *as amended by* 1983 N.Y.Laws ch. 617, § 1; *see also* n. 6, *infra.*

6. The labeling provisions of the statute require that:

The word "imitation" must appear on the labels of imitation cheese and imitation cheese food in letters of the same color, same contrasting background, and of equal size as the brand name or product designation, whichever is larger. "Imitation" must immediately precede the brand name or printed product designation, without intervening printed or graphic matter, everytime the brand name or product designation appears on the label. Labels of products containing imitation cheese or imitation cheese food must bear the words "contains imitation cheese" or "contains imitation cheese food" immediately preceding the name of the food. The letters in the quoted phrase must be in the same color, on the same contrasting background, and of equal size as the letters in the product designation.

imitation cheese or imitation cheese food product.[7]

The Commissioner of the New York Department of Agriculture and Markets issued final regulations implementing the statute which were to become effective on February 1, 1984. Pending the outcome of this litigation, however, the Commissioner has agreed not to enforce the statute and its regulations. The regulations define "imitation" cheese as "any food which is similar in texture, color, flavor, taste, and appearance" to cheese. 1 NYCRR §§ 18.-1(c) & (d). Thus, the New York regulations require the word imitation on nutritionally equivalent or superior substitute cheese products instead of the federal requirement of the word "substitute" or other common or descriptive term. This conflict in definition as well as the additional labeling, sign posting and menu notification requirements form the basis of plaintiff's claims.

## STANDING

■■■ Defendants' initial argument that GMA lacks standing to bring this action is without merit.[8] The standing of an association to assert the rights of its members is well established. *See Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1976); *National Motor Freight Ass'n v. United States*, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). In *Hunt*, the Court stated that an association may have standing if:

The association ... allege[s] that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.... So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction.

432 U.S. at 342–43, 97 S.Ct. at 2440–41, quoting *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975).

■■ Plaintiff's members are engaged in the business of producing, selling and distributing food products throughout the United States. Affidavit of Sherwin Gardner, Vice President, Science and Technology, GMA, sworn to January 17, 1984. Implementation of the New York statute will have an immediate and direct effect on them. *See e.g.*, Affidavit of Thomas Brennan, District Manager of Industrial Products, Schreiber Foods, Inc. sworn to on January 12, 1984. Moreover, since "neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit," *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441, the individual

7. The sign and menu posting provisions require that:

Establishments which offer products containing imitation cheese or imitation cheese food for carryout or on premises consumption must prominently post a sign which state the product designation of the food followed immediately by the words "contains imitation cheese" or "contains imitation cheese food." The letters on the sign must be in block letters at least three inches high in height and on a contrasting background which can be easily read by consumers under normal conditions of purchase.

Service food establishments which offer any product containing imitation cheese or "imitation cheese food product" must state on the menu that the product "contains imitation cheese" or "contains imitation cheese food." The quoted phrase must immediately follow

the product designation on the menu, and it must be in letters of equal size and on a contrasting background.

Service food establishments which place imitation cheese or "imitation cheese food product" on tables, or otherwise make it available for use by customers, must conspicuously label the container of such product "imitation cheese" or "imitation cheese food product."

8. In their answer, the Commissioner also suggests that plaintiff's claims are barred by the eleventh amendment. The eleventh amendment simply does not prevent the declaratory and injunctive relief sought by GMA, *see Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), nor does it prevent an award of attorneys fees under 42 U.S.C. § 1988 in a proper case. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

members themselves are not indispensable parties. Under the *Hunt* standard, therefore, GMA has standing to assert the rights of its members in contesting the labeling provisions of the New York statute.

■ Further, GMA —as the representative of manufacturers and distributors of food products— is a proper party to press a challenge to the sign and menu posting requirements of the New York statute even though those provisions apply only to food service establishments. Uncontroverted affidavits submitted by GMA fully support a finding that it's members will suffer direct and immediate harm in the form of lost sales as the result of the sign and menu posting requirements of the New York statute. Affidavit of Thomas Brennan, District Manager of Industrial Products, Schreiber Foods, Inc. sworn to on January 12, 1984; Affidavit of George W. Cawman, Vice President of Marketing, Schreiber Food, Inc. sworn to on December 13, 1983; Affidavit of Olindo DiFrancesco, President, Olindo's Food, Inc. sworn to on January 17, 1984. As indicated by the affidavit of Thomas Brennan, *supra,* the likely consequence of the sign and menu posting requirements is that food service establishments will purchase only natural cheese products in order to avoid compliance with the statute and the stigma associated with the term "imitation." I find therefore that under the *Hunt* standard, GMA also has standing to challenge the sign and menu posting requirements of Section 63.

## PREEMPTION

Both the FDA and the USDA agree that the sign and menu posting requirements of the New York statute are not preempted by the FDCA, FMIA or the PPIA. GMA's challenge to those provisions under the Commerce Clause will be addressed in a later section. The more difficult matter raised by the New York Imitation Cheese Statute is whether the labeling regulations are preempted by the respective federal statutes under the Supremacy Clause of the United States Constitution. The Com-

missioner argues that the federal regulations govern only the labeling of imitation cheese and do not extend to the labeling of food products which merely contain artificial cheese. Thus, defendants contend that the state is not preempted from issuing its own regulations in the related field.

### A. *The Federal Meat and Poultry Acts*

#### (1) The Preemptive Effect of the Federal Regulations

Both the FMIA and the PPIA explicitly address the labeling and ingredient requirements for all federally inspected meat and poultry food products transported in interstate commerce. In fact, the USDA is now considering proposed regulations on the labeling of meat and poultry food products containing cheese substitutes and a revised standard of identity for meat-topped pizza which would include a consideration of imitation cheese. Affidavit of Robert Hibbert, *supra,* at ¶ 6; 48 Fed.Reg. 35654–59 (Aug. 5, 1983). Each statute provides that while the state may exercise concurrent jurisdiction in enforcing the federal regulations, it may not impose labeling requirements that are "in addition to, or different than, those made under" the respective acts. 21 U.S.C. §§ 678 & 467e. The New York regulations, which require meat and poultry products to be labeled in a manner other than that prescribed by the USDA, are "in addition to or are different than" the federal regulations in contravention of the express preemption provision of the FMIA and the PPIA. *See Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (California practice of determining average net weight of meat food packages different from federal law is preempted; *Armour & Co. v. Ball,* 468 F.2d 76 (6th Cir.1972), *cert. denied,* 411 U.S. 981, 93 S.Ct. 2267, 36 L.Ed.2d 957 (1973) (Michigan law establishing standards of identity for sausage different from federal standards is preempted). The preemption provision found in the PPIA, in fact, was a Congressional response to a decision of the Second Circuit upholding a New York statute which imposed state labeling requirements for turkeys which were in addition to the

labeling requirements of federal law. *See Swift & Co. v. Wickham,* 364 F.2d 241 (2d Cir.1966), *cert. denied,* 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967); Pub.L. 90–492 (Aug. 18, 1968) (adding to 21 U.S.C. § 467e); 90 H.Rep. No. 1333, 90th Cong.2d Sess. *reprinted in* 1968 U.S.Code Cong. & Ad.News 3426, 3427 (extending federal regulation to ensure state requirements at least equal to federal).

■ Moreover, the USDA has unequivocally stated that labels consistent with New York's regulatory scheme will not be approved by the agency if the product to be labeled is not nutritionally inferior to the product for which it substitutes. Affidavit of Donald Houston, Administrator of the Food Safety Inspection Service, United States Department of Agriculture, sworn to Feb. 2, 1984 at ¶ 8; Affidavit of Robert G. Hibbert, Director of Standard and Labeling Division, Meat and Poultry Inspection Technical Services, Food Safety and Inspection Service, United States Department of Agriculture sworn to Dec. 9, 1983 at ¶¶ 7 & 8. Thus, as to those meat and poultry products containing cheese substitutes which are subject to federal inspection and labeling provisions under the FMIA and the PPIA, the New York provisions are expressly preempted.

(2) Validity of the Federal Regulations

In apparent recognition that the New York statute is preempted, the Commissioner attacks the validity of the USDA's "imitation policy" asserting that the USDA policy of applying the FDA's definition of imitation is procedurally defective because there was no formal notice and comment period as required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 522, *et seq.* The distinction between a "rule" as defined in 5 U.S.C. § 551, which must be published with a notice and comment period, and "a general statement of policy" or an "interpretative rule" which are each excluded from the requirements of the APA, 5 U.S.C. § 553(b)(3)(A), "is enshrouded in considerable fog." *Noel v. Chapman,* 508

F.2d 1023, 1030 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975).

Faced with a similar problem, the District of Columbia Circuit Court of Appeals distinguished the three terms in *Pacific Gas & Elec. Co. v. FPC,* 506 F.2d 33 (D.C. Cir.1974), and held that an order of the Federal Power Commission establishing a priority schedule for curtailing delivery of natural gas in time of shortage was a general statement of policy. *Id.* at 41. The Court explained that "[a] general statement of policy is the outcome of neither rulemaking nor an adjudication, it is neither a rule nor a precedent but is merely an announcement which the agency hopes to implement in future rulemakings or adjudications." *Id.* at 38. "Interpretative rules are similar in some respects to general statements of policy ... An interpretative rule expresses the agency's view of what another rule, regulation, or statute means." 506 F.2d at 37 n. 14. On the other hand, the court found that a rule "establishes a standard of conduct which has the force of law." *Id.* at 38. It memorializes a binding norm not subject to challenge by individual parties. In holding that the FPC's order was a statement of general policy, the Court noted that the Commissioner intended "to establish the policy by proceeding through individual adjudications." *Id.* at 41.

■ Applying that standard to this case, I find that the USDA's imitation food policy is more akin to a statement of general policy or an interpretative rule than to a rule which requires formal notice and comment proceedings. Because the policy is merely an interpretation of a statutory term not defined by the relevant statute, it may be an interpretative rule. I believe, however, that the policy is a statement of the general policy of the agency pending the outcome of rulemaking proceedings. After reviewing the FDA's 1973 definition of imitation, the USDA stated in 1979 in the Federal Register that the tentative position of the agency was to follow the 1973 FDA regulations pending further comment and formal rulemaking proceedings. 44

Fed.Reg. 76008 (Dec. 21, 1979). The USDA expressly adopted the policy in 1981 through the adjudicatory process in *In Re Castleberry's Food Co.*, FMIA Docket No. 36 (Sept. 18, 1981) which was made available to the public in accordance with 5 U.S.C. § 552(a)(2).[9] Formal rulemaking proceedings are presently pending. Moreover, the statutory scheme expressly permits the implementation of the policy on a case by case basis by requiring that all labels be individually approved by the agency prior to shipment in interstate commerce and that challenges to USDA labeling decisions to be made through individual adjudications. *See* 21 U.S.C. §§ 607(d) & (e); 21 U.S.C. §§ 457(c) & (d). Thus, it appears to me that the USDA's adoption of the FDA's definition of "imitation" is merely a statement of general policy that is not procedurally invalid on the grounds that there was no formal rulemaking. *See also* 5 U.S.C. § 553(b)(3)(A); *Noel v.. Chapman,* 508 F.2d 1023 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975); *Continental Oil Co. v. Burns,* 317 F.Supp. 194 (D.Del.1970); K. Davis, Administrative Law Treatise §§ 7:4 & 7:5 (2d ed. 1979).

Even if I were to find the federal regulation invalid, the preemption provisions alone appear to preclude state regulation of meat and poultry food products containing imitation cheese. New York's regulations requiring the term imitation on all labels are "in addition to" the federal standard and are thus, expressly preempted. Besides his challenge to the procedural validity of the regulation, the Commissioner raises a question as to the substantive validity of the definition of imitation as adopted by the FDA. I turn to this argument in the following section in addressing preemption under the FDCA.

### B. *The Federal Food Drug and Cosmetic Act.*

#### (1) The Preemptive Effect of the Federal Regulations

■ The regulatory scheme promulgated under the FDCA likewise preempts the labeling of food products which resemble or substitute for cheese or which contain cheese substitutes. The Commissioner, however, argues that the FDCA does not preempt New York's statute because, unlike the FMIA and the PPIA, the FDCA contains neither explicit labeling provisions applicable to artificial cheese nor an express preemption provision. In support, the Commissioner relies on *Corn Products Refining Co. v. Eddy,* 249 U.S. 427, 39 S.Ct. 325, 63 L.Ed. 689 (1919), in which the Supreme Court held that, absent federal action, the state retains its right to provide for adequate safeguards against deception in the sale of food products. The Commissioner's argument, however, ignores the preemptive effect of the federal regulations that implement the FDCA. When Congress has given an agency the authority to act, the resulting "federal regulations have no less preemptive effect than federal statutes." *Fidelity Sav. & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1981). Consequently, the issue is whether the regulatory scheme, read in conjunction with the federal statute, has impliedly preempted the field.

■ The Supreme Court recently discussed the standard I must apply in determining whether state laws are preempted by federal law in *Silkwood v. Kerr-McGee,*

9. Section 552(a)(2) of the Administrative Procedure Act provides in pertinent part that:

Each agency, in accordance with published rules, shall make available for public inspection and copying—
(A) final opinions ... made in the adjudication of cases ...
(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register
...

A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than the agency only if—
(i) it has been indexed and either made available or published as provided by this paragraph; or
(ii) the party has actual or timely notice of the terms thereof.

—— U.S. ——, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). The Court explained that:

> state law can be preempted in either of two general ways. [a.] If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted.... [b.] If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent that it actually conflicts with federal law ... or where state law stands as an obstacle to the accomplishment of the full purpose and objectives of Congress.

*Id.* at 621 (citations omitted). Plaintiff argues that the New York regulations are invalid under either analysis. I will address each argument in turn.

#### (a) Congressional Intent to Occupy the Field

■ GMA contends that the FDCA manifests a Congressional desire to comprehensively regulate the labeling of food products shipped in interstate commerce leaving no room for state regulation. In considering similar arguments, the Supreme Court has cautioned that "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion or that Congress has unmistakably so ordained." *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). The test for determining regulatory preemption is whether the agency intended its regulations to supersede state law. *Fidelity Federal Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 154, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1981).

The principal focus of the FDCA is to "keep impure and adulterated [food and] drugs out of the channels of commerce." *62 Cases of Jam v. United States*, 340 U.S. 593, 596, 71 S.Ct. 515, 95 L.Ed. 566 (1951). The federal labeling provisions in question here were specifically "designed to protect the public from inferior foods resembling standard products but marketed under dis-

tinctive names. *See* S.Rep. No. 361, 74th Cong. 1st Sess. 8–11." *Id.* at 600, 71 S.Ct. at 520. Nothing in the FDA regulations necessarily reflects an intention by the FDA to displace the imitation food labeling requirements of a state. The statute itself does not reveal an unmistakable intention to oust state regulation. Moreover, plaintiff has not demonstrated that there is an overwhelming need for national uniformity or that the statute was designed to create such uniformity. Thus, there is no persuasive reason for me to find that Congress intended to occupy the field. *Cf. Swift & Co. v. Wickham*, 364 F.2d 241, 244 (2d Cir.1966) (the court, in dicta, notes that the FDCA does not preempt state regulation), *cert. denied*, 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967).

#### (b) Actual Conflict

■ In my view, however, the state regulations are preempted because they are in conflict with the federal regulations. In *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978), the Supreme Court explained that:

> A conflict will be found "where compliance with both federal and state regulations is a physical impossibility ...," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248, 98 S.Ct. 988, 994, 55 L.Ed.2d 179] (1963), or where the state "law stands as an obstacle to the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941); *Jones v. Rath Packing Co., supra*, [430 U.S.] at 526, 540–541 [97 S.Ct. at 1310, 1317]. *Accord, De Canas v. Bica*, 424 U.S. 351, 363 [96 S.Ct. 933, 940, 47 L.Ed.2d 43] (1976).

The New York regulations require that all cheese substitutes or food containing cheese substitutes be labeled "imitation" even though the FDA would require that only "nutritionally inferior" products be labeled with the term. The FDA expressly found that labeling all substitutes as imitation is misleading and confusing to consum-

ers. 38 Fed.Reg. 2138 (Jan. 19, 1973). Instead, the federal regulations require nutritional equivalent products to be labeled by a common or descriptive term, e.g., mozzarella cheese substitute. The New York standard as applied to nutritionally equivalent or superior products is contrary to the federal standard and products labeled as such would be deemed misbranded under the federal statute. *See* 21 U.S.C. § 434(c); 21 F.F.R. § 101.3(e); Affidavit of Robert Hibbert, *supra* at ¶ 7 & 8; Affidavit of Donald Houston, *supra,* at ¶ 8. Thus, if a manufacturer complies with the New York statute, the manufacturer would, at the same time, violate the federal regulations and would therefore be subject to sanctions under the federal statute for misbranding. In short, compliance with both regulations is impossible.

The Commissioner suggests that the New York regulations are consistent with federal regulations because the language of the regulations do not preclude "a nutritionally equivalent" food product from being labeled an "imitation." Although the FDA has determined that some nutritionally equivalent products may be designated as "imitation," 38 Fed.Reg. 20702–703 (Aug. 2, 1973), the agency has also determined the specific circumstances under which that can occur. It has stated that:

> A manufacturer or distributor may label a substitute food which is not nutritionally inferior to the traditional food as an imitation *if he concludes that the product is inferior in some other way and if the use of the term is not misleading.*

*Id.* (emphasis added). Thus, any question as to when use of the label "imitation" is required is foreclosed by the FDA's regulations.

In addition, the New York regulations frustrate FDA's dual purpose of encouraging the development of nutritious foods and of informing the public of "the actual characteristics and properties of a new food product." *See* 38 Fed.Reg. 2138 (Jan. 19, 1973); *accord,* 38 Fed.Reg. 20702 (Aug. 2, 1973). The FDA has expressly rejected the Commissioner's *per se* application of the term "imitation" to all food substitutes because the term connotes inferiority and would thereby discourage the development of nutritionally superior products in contravention of Congressional intent in passing the FDCA. 38 Fed.Reg. 2138 (January 18, 1973). Moreover, the FDA found that the indiscriminate use of "imitation" on all foods leads to consumer confusion which the FDCA was designed to prevent. Thus, the state regulation interferes with the "accomplishment and execution of the full purposes and objectives" of the agency's regulations. *See Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1977) citing *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Under these circumstances, where the state regulations directly conflict with federal law and in fact, stand as an obstacle to the accomplishment of the purpose of the federal law, the state regulations are preempted by the federal regulatory scheme.

### (2) Validity of the Federal Definition of Imitation

The Commissioner's primary argument in support of the state regulations is that the FDA and the USDA are not enforcing the respective statutes as Congress intended. None of the pertinent federal statutes define the term "imitation."[10] The Commissioner argues, however, that judicial

---

**10.** The Filled Milk Act, 21 U.S.C. §§ 61–64, in particular, lends little support to the Commissioner's position. The statute, which was enacted in 1923 and held unconstitutional in *Milnot v. Richardson,* 350 F.Supp. 221 (D.Ill.1972), precluded any person from manufacturing or shipping in interstate commerce any item of "filled milk". 21 U.S.C. § 61. "Filled milk" was defined as any milk … "to which has been added … any fat or oil other than milk fat, so that the resulting product is in imitation or

semblance of milk...." 21 U.S.C. § 61(c). The statute did not apply to the labeling of food products. Neither the Act nor the few cases construing it expressly define the term "imitation." *See e.g., Carolene Products v. United States,* 323 U.S. 18, 65 S.Ct. 1, 89 L.Ed. 15 (1944). Rather, the statute merely presented an absolute ban on all substitute milk products whether or not the product was an imitation or was informatively labeled.

precedent construing the term requires the federal agencies to adopt a definition which comports with the term's ordinary and plain meaning. This, defendant contends, is precisely what New York has done in requiring all artificial cheese products that resemble traditional cheese in taste, smell, texture and appearance to be labeled imitation. Because the agencies have ignored this precedent, the Commissioner argues that the FDA's definition of imitation is contrary to the FDCA and is invalid.

In *Federation of Homemakers v. Schmidt,* 539 F.2d 740 (D.C.Cir.1976), the District of Columbia Circuit Court of Appeals deferred to the expertise of the FDA in promulgating its definition of imitation and found that the regulation which takes into account only nutritional inferiority is "well within the zone of reasonableness required of agency rulemaking." 539 F.2d at 743–744. The Eighth Circuit adopted the reasoning of the Court in *Homemakers* and again upheld the regulation in *National Milk Producers' Federation v. Harris,* 653 F.2d 339 (8th Cir.1981). The Commissioner challenges the reasoning of each decision on the ground that the Courts improperly deferred to the agency's interpretation of a statutory term. I disagree. Certainly, statutory interpretation is a question of law which, as a general rule, is freely reviewable. Nevertheless, "the interpretation of an agency charged with the administration of a statute is entitled to substantial deference," *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1981), unless the agency's interpretation is "contrary to the indications of the statute itself." *SEC v. Sloan,* 436 U.S. 103, 117, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1977).

The Commissioner cites no legislative authority which indicates that Congress intended to adopt a standard for imitation that requires consideration of texture, color, flavor, taste and appearance. My own research discloses none. Cases construing the term "imitation" prior to the issuance of the 1973 regulations, however, do tend to support the Commissioner's position.

*See e.g., 62 Cases More (or Less) of Jam v. United States,* 340 U.S. 593, 599–600, 71 S.Ct. 515, 519–520, 95 L.Ed. 566 (1951); *United States v. 651 Cases, More or Less, of Chocolate Chil-Zert,* 114 F.Supp. 430, 432 (N.D.N.Y.1953). In each of these cases, the Courts struggled with the definition of the term "imitation" and considered whether the substitute food product resembled the traditional food in terms of taste, smell, texture and appearance. The only consistent holding to be extrapolated from the cases is that the term "connotes inferiority". *62 Cases of Jam v. United States,* 340 U.S. at 599, 71 S.Ct. at 519; *United States v. 651 Cases, … of Chocolate Chil-Zert,* 114 F.Supp. at 432.

The FDA regulation is not to the contrary. As a practical matter, the agency must consider taste, smell, texture and appearance in order to make the preliminary determination that the product is a substitute for or resembles a traditional food. *See In Re: Castleberry's Food Co.,* FMIA No. 36 (USDA 1981). Moreover, the FDA's definition preserves the notion of inferiority. The imitation standard merely defines inferiority in terms of a product's nutritional content and requires that a product which is nutritionally inferior to the food it resembles be labeled imitation. Nutritionally equivalent products may only be labeled imitation if the product is inferior to the traditional food for some other reason. The agency's abandonment of taste, smell and appearance as the test of inferiority in favor of a nutritional equivalency standard because the former test was too subjective is well within the discretion granted to it by Congress. *See Weinberger v. Hynson, Wescott & Dunning, Inc.,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *CIBA-Geigy Corp. v. Richardson,* 446 F.2d 466, 468 (2d Cir.1971).

Furthermore, Congress appears to be satisfied with the FDA's standard for imitation because, although it has twice amended the FDCA misbranding provisions since the regulations were issued, Pub.L. 94–278 (1976) (adding § 343(a)(1) and (2)); Pub.L. 95–203 (1978) (adding §§ 343(o) & (p)), Con-

gress has not acted to amend FDA's imitation standard. *See United States v. Rutherford*, 442 U.S. 544, 554, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68 (1978) (that Congress has not acted to correct any misperception of its statutory objectives on an issue of public importance weighs in favor of deference to the agency's construction).

The FDA's regulations defining "imitation" represent a carefully considered effort to construe a statutory term not defined by Congress. The notice of proposed rulemaking published in 1973 stated that the term must be defined in light of its common understanding and must take into account recent advances in the industry which have developed food substitutes that are not inferior to the products for which they substitute. 38 Fed.Reg. 2138 (Jan. 19, 1973). The agency recognized that applying the term "imitation" to nutritionally equivalent or superior foods would be misleading to the consumer because traditional notions of the term suggest inferiority. *Id.* In August of 1983, after a notice and comment period, the FDA reaffirmed its existing definition of "imitation," 48 Fed.Reg. 37665 (Aug. 19, 1983), and noted that consumer recent surveys supported a finding that the term "imitation" connotes an inferior product. *Id.* at 37665–66. As the Court stated in *Homemakers*, "the new regulation successfully reconciles the need to alert the public to inferior products with the proscription in subsection 343(a) against false or misleading labels." *Federation of Homemakers v. Schmidt*, 539 F.2d 740, 743 (D.C.Cir.1976).

In arguing that the Court in *Homemakers* improperly deferred to the agency's expertise, defendants urge me to follow *Swift & Co., Inc. v. Walkley*, 369 F.Supp. 1198 (S.D.N.Y.1973) (Weinfeld, J.). In *Swift*, the court denied a motion by a manufacturer of imitation frankfurters to enjoin the state from requiring a meat product bearing a USDA approved label to be labeled "imitation frankfurter." Judge

Weinfeld did not address the FDA's recently issued "nutritionally inferior" standard for imitation food. Instead, the court reasoned that the USDA's admitted disregard of the statute did not prevent the state from exercising its concurrent jurisdiction to enforce it. *Id.* The case does not warrant a different result here. The FDA has not refused to enforce the statute nor, as the result here shows, has it issued standards contrary to the FDCA. I believe that the Eighth and District of Columbia Circuits properly deferred to the agency's expertise and find that the regulation as issued is valid.

### COMMERCE CLAUSE

■ As a second ground for enjoining Section 63, plaintiff argues that the statute imposes an impermissible burden on interstate commerce. In deciding whether the state requirements unconstitutionally burden interstate commerce the threshold inquiry is whether the state regulation operates even-handedly between intrastate and interstate commerce to effectuate a legitimate local public interest. *Hughes v. Oklahoma*, 441 U.S. 322, 332, 336, 99 S.Ct. 1727, 1734, 1736, 60 L.Ed.2d 250 (1979); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1969). In this case, I have no doubt that the regulations operate even-handedly to the extent that all foodstuffs containing imitation cheese are subject to the menu and sign posting requirements. The question thus devolves to whether, despite the even-handed operation of the regulations, the burden on interstate commerce is excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. at 142, 90 S.Ct. at 847. Because I have already found that the labeling provisions of the New York statute are invalid, I need only consider whether the burden the sign and menu posting provisions place on interstate commerce is excessive in light of the putative local benefits.[11]

---

11. The Commissioner's contention that 21 U.S.C. § 25, which was enacted in 1902, removes the Commerce Clause issue from this

case is baseless. The statute provides, in part, that:

### A. *Asserted Local Benefits*

The New York regulations are intended to promote a legitimate and, indeed, laudible purpose. The statute was enacted to promote informed consumerism and fair competition by preventing fraud and deception in the marketing of alternative cheese products. Regulation of the production of foodstuffs market has traditionally been a matter of local concern. *Florida Avacado and Lime Growers v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *American Meat Institute v. Ball*, 550 F.Supp. 285, 287 (W.D.Mich.1982). So, too, has been the protection of consumers from deception and fraud. *Savage v. Jones*, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182 (1912). The state clearly has a legitimate interest in protecting purchasers from the adverse consequences of unknowingly consuming inferior cheese substitutes. The sign and menu regulations which would require the labeling of inferior products as imitation would effectuate that purpose.

 The statute as applied to nutritionally equivalent and superior cheese products, however, reaches beyond that limited interest and attempts to prevent consumer deception in the consumption of cheese food products that will not affect the consumer's nutritional well-being. Nutritionally equivalent and superior cheese substitutes have nutritional, dietary, medical, religious and economic advantages not found in traditional cheese products. *See* Affidavit of Dr. Robert G. Bursey, Manager, Nutrition Research, Kraft, Inc., sworn to January 11, 1984; T. Graff, Report of Economic Impact of Imitation Cheese, August, 1982, Exhibit 2 to Plaintiff's Reply Brief; Affidavit of R.W. Nicholas, Director, Institutional Food Products, Anderson Clayton Foods, sworn to January 11, 1984. The blanket labeling of all substitutes as "imitation" does little to convey to the consumer information as to the ingredients, nutritional value or effect on the consumer's health. In fact, the blanket labeling requirement may itself cause consumer confusion because consumers equate the term "imitation" with inferior products and because all other food products are labeled under the federal standard. *See e.g.*, Affidavit of Thomas Blaisdell Smith, Director of Government Affairs, Public Voice for Food and Health Policy sworn to January 10, 1984.

As an example, in *American Meat Institute v. Ball*, 550 F.Supp. 285 (W.D.Mich. 1982), *aff'd on other grounds*, 724 F.2d 45 (6th Cir.1984), a Michigan state statute requiring that meat products not meeting Michigan standards be accompanied by a placard stating that such products "do not meet Michigan's high ingredient standards but do meet lower federal standards," was found to have little, if any, local public benefit for similar reasons. In finding that the statute promoted no legitimate state interest, the court stated that "the Michigan placard does not rectify any lack of meaningful information, but merely substitutes one form of incomplete information for another." *Id.* at 292. I likewise believe that the menu and sign posting requirements as applied to all substitute cheese products do little to effectuate the purpose of the statute and thus, have limited value to the public.

### B. *Burden on Interstate Commerce*

As a practical matter, food service establishments will have no method of determin-

---

All articles known as ... imitation cheese, or any substance in the semblance of butter or cheese not the usual product of the dairy and not made exclusively of pure and unadulterated milk or cream, transported into any State ... and remaining therein for use, consumption, sale or storage therein, shall, upon the arrival within the limits of such State ... be subject to the operation and effect of the laws of such State .... 21 U.S.C. § 25. One of the few cases to construe the statute make it clear that Congress, in passing 21 U.S.C. § 25, intended to preserve to the states their traditional police powers of protecting its citizens from adulterated foods. *Cloverleaf Co. v. Patterson*, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754 (1941). As the Court noted in *Cloverleaf*, however, 21 U.S.C. § 25 does not permit a state to act in a way "inconsistent with federal legislation." I should also note that the Commissioner has cited no authority, except the statute itself, for this broad proposition.

672

ing whether the product they serve is an imitation within the meaning of the state statute. The only notice a restauranteur or store owner may have of what is being served is through the packaging of the product by the manufacturer yet the manufacturer is not required to comply with the labeling provisions of the statute. Under these circumstances, the retailer has few alternatives; he will be unable to comply with the statute, will opt in favor of serving only natural cheese, or will insist that the manufacturer provide information sufficient to insure the retailer's compliance with the statute. If he chooses either of the latter alternatives, I am faced with the question of whether, despite the putative local benefits, the statute places an excessive burden on interstate commerce.

There is no question that the implementation of the New York regulations will have an immediate and direct impact on interstate commerce. The State regulations will necessarily increase the costs of doing business in New York for plaintiff's members as they will incur additional expenses in providing necessary information to retailers. *See* Exhibits 7–15 to Plaintiff's Reply Brief. Producers, desirous of continuing to do business in New York, will be compelled to provide information to the retailer in addition to that required by federal law which will be limited to use in New York. Moreover, as the affidavit of Thomas Brennan, *supra,* demonstrates, GMA's members will suffer direct loss in the form of lost sales if the retailer chooses to serve only natural cheese. *See also* Affidavit of George W. Cawman, *supra.* The affidavit of Olinda DiFransesco, *supra,* indicates that because of the anticipated enforcement of the New York statute, some manufacturers have already suffered a loss of sales.

Furthermore, there are less burdensome means of serving the same objectives. Inasmuch as the federal government has found it possible to protect consumers from misleading packaging through its ingredients requirements, it cannot be said that less burdensome measures are not available to New York. In view of the questiona-

ble local benefits to be achieved by the regulations, I find that the New York sign and menu posting provisions impose an unacceptable burden on interstate commerce.

Because I have ruled that the labeling provisions of Section 63 of the New York Agriculture and Markets Law as interpreted by the Commissioner's regulations are preempted by federal regulations and that the menu and sign posting provisions of the statute place an unreasonable burden on interstate commerce, I need not address plaintiff's equal protection or state law claims.

For the reasons stated above, New York's Imitation Cheese Statute, N.Y. Agric. & Mkts. Law § 63 (McKinneys Supp. 1983), and its implementing regulations, 1 NYCRR 18, are unconstitutional and a permanent injunction enjoining defendants from enforcing those provisions is granted. Plaintiff's request for attorneys fees is denied.