**COMMITTEE FOR ACCURATE LABELING AND MARKETING, an Illinois not-for-profit corporation, Plaintiff,**

v.

**Sam BROWNBACK, Secretary of the Kansas State Board of Agriculture; Archie Hurst, Dairy Commissioner of the State of Kansas; and the Kansas State Board of Agriculture, Defendants.**

No. 86–4296–R.

United States District Court, D. Kansas.

July 8, 1987.

Donald Patterson, Michael K. Seck, Fisher, Patterson, Sayler & Smith, Topeka, Kan., George M. Burditt, Alan I. Becker, Burditt, Bowles & Radzius, Ltd., Chicago, Ill., Richard L. Frank, Olsson & Frank, P.C., Washington, D.C., for plaintiff.

Kenneth M. Wilke, Sp. Asst. Atty. Gen., Kansas State Bd. of Agr., Topeka, Kan., for defendants.

### MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an action brought by the Committee for Accurate Labeling and Marketing (CALM), a trade association of food manufacturers, suppliers and customers, challenging the constitutionality of the Kansas Artificial Dairy Products Act, K.S.A. 65–761 *et seq.* CALM seeks both declaratory and injunctive relief. They contend that the Kansas law violates the Supremacy Clause, the Commerce Clause and the Fourteenth Amendment's Equal Protection Clause of the United States Constitution. The court has held a trial on this matter and is now prepared to issue the following findings of fact and narrative conclusions of law.

### FINDINGS OF FACT

1. Plaintiff CALM is a trade association of food manufacturers, suppliers and customers.

2. Defendant Sam Brownback is the Secretary of the Kansas State Board of Agriculture. Defendant Archie Hurst is the Dairy Commissioner of the State of Kansas.

3. In 1985, the Kansas legislature enacted the Kansas Artificial Dairy Products Act (KADPA). K.S.A. 65–761 *et seq.* The stated intent of the KADPA was to "protect the consumers of this state from confusion, fraud and deception, to prohibit practices inimical to the general welfare, and to promote the orderly and fair marketing of dairy products." K.S.A. 65–761.

4. Under the KADPA, an artificial dairy product is defined as follows:

[A]ny food which by its composition, intended use, sensory qualities, physical properties, package or label description purports to resemble or imitate any dairy product, but does not include: (1) Any distinctive proprietary food compound not readily mistaken for a dairy product, which is customarily prepared and designed for medicinal or special dietary use and predominantly so labeled; or (2) any dairy product flavored with chocolate or cocoa or enriched with vitamins when the nonmilk fats or oils contained in the product do not exceed the amount of cocoa fat naturally present in the chocolate or cocoa used, and the food oil, not in excess of .01% of the weight of the

finished product, is used as a carrier of the vitamins. K.S.A. 65–762(d).

5. The KADPA makes it unlawful for any person, directly or indirectly, to knowingly manufacture, sell or exchange an artificial dairy product which does not adhere to its labeling requirements. K.S.A. 65–763.

6. Artificial dairy products are to be labeled as follows:

(a) The statement "an artificial dairy product" must be indicated in the upper 30% of the principal display panel of the package or container of an artificial dairy product. The statement shall not be less than ½ of the size of the product name or ¼ of an inch or 18 point type, whichever is larger. The statement must be of similar type, style and color to the product name.

(b) Artificial dairy products shall comply with the applicable federal requirements set forth in section 403 of the federal food, drug and cosmetic act and in sections 101 and 105 of title 21 of the code of federal regulations.

(c) The product name of an artificial dairy product must be presented in bold face type on the principal display panel and must be in lines generally parallel to the base of the container or package.

(d) Every artificial dairy product shall provide, on the principal display panel, a statement of the major differences between the artificial dairy product and the dairy product it resembles. The information must be in a type size which is at least 25% of the size of the name of the artificial dairy product, nor less than ⅛ of an inch. This information shall include the differences in the fat or oil used and the major differences in the basic ingredients used to replace nonfat milk solids.

(e) A nutritional information panel must be provided on an artificial dairy product which indicates in comparative columns the quantitative nutritional differences between the artificial dairy product and the dairy product that it resembles. The nutrients to be included

are those for which United States recommended daily allowances have been established. K.S.A. 65–764.

7. The KADPA exempts the following products from its provisions: pizza, dry coffee whiteners, liquid coffee whiteners, dips, dressings, whipped topping and margarine or margarine-type products. K.S.A. 65–768.

8. The Secretary of the Kansas State Board of Agriculture is charged with the administration and enforcement of the KADPA. K.S.A. 65–765 and 65–767. The Secretary has delegated the administration and enforcement of the KADPA to the Dairy Commissioner.

9. The labeling of all food products shipped in interstate commerce is regulated generally by the Federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.*, and its implementing regulations promulgated by the Food and Drug Administration (FDA), 21 C.F.R. § Part 100, *et seq.* A food product is required by the FDCA to bear its "common or usual name ... if any there be." 21 U.S.C. § 343(i). The FDCA specifically prohibits misbranded foods. A food product is misbranded if it is sold under the name of any other food, 21 U.S.C. § 343(b), or if it purports to be a food for which a standard of identity has been prescribed by regulation and it does not conform to that standard, 21 U.S.C. § 343(g).

10. The FDCA further provides that a food which is an imitation of another food product is misbranded "unless the label bears, in type of uniform size and prominence, the word 'imitation' and, immediately thereafter, the name of the food imitated." 21 U.S.C. § 343(c). The FDCA does not, however, define "imitation." In 1973, the FDA promulgated a regulation defining imitation food as food which "is a substitute for and resembles another food but is nutritionally inferior to that food." 21 C.F.R. § 101.3(e). Nutritional inferiority is determined by comparing percentages of "essential nutrients" in the substitute food to those in the food for which it substitutes. 21 C.F.R. § 101.3(e)(4). The essen-

tial nutrients are protein and the nineteen vitamins and minerals for which the federal government has established recommended daily allowances. *Id.,* § 101.9. Basically, if the substitute food contains less of any essential nutrient present to a measurable degree in the food substituted for, the substance must be labeled with the word "imitation." Thus, a nutritionally equivalent or superior substitute food would be misbranded under federal law if it was labeled with the term "imitation." There is one exception to this general rule, but it has no application to the instant case. *See* 21 C.F.R. § 101.3(e)(4)(iii). Such foods must be identified by an appropriate common or usual name or, if none exists, a descriptive term. 21 C.F.R. § 101.3(e).

11. The promulgation of the regulations concerning "imitation" food products came after substantial debate and consideration. The FDA had two objectives in passing these regulations: to inform the public of the "actual characteristics and properties of a new food product," and to encourage manufacturers to fortify their substitute food products to the level of nutritional equivalence. The FDA recognized that the addition of the word "imitation" to a food product's label was derogatory and connoted inferiority.

12. The members of CALM manufacture and distribute various food products, some of which are substitutes for standardized natural cheese, processed cheese, or cheese. The principal ingredients in the substitute products generally are casein, a protein derived from milk, and vegetable oil. The substitute products are "artificial dairy products" as defined under the KADPA.

13. The substitute products are lower in price, cholesterol and saturated fats than their standardized counterparts.

14. The members of CALM sell substantial quantities of the substitute products in commerce which are ultimately sold through retail outlets in Kansas.

15. Many of the substitute products manufactured by the members of CALM are fortified with nutrients so as to make them nutritionally equivalent or superior to their standardized counterparts. Substitute products which are not nutritionally equivalent are labeled "imitation" pursuant to the requirements of the aforementioned federal regulations.

16. The addition of the words "artificial dairy product" to the label of a substitute food product is both misleading and derogatory. The requirements of the KADPA will certainly result in lost sales of substitute food products in Kansas. Consumers view the term "artificial" to be functionally equivalent to the term "imitation."

17. The incentive of a substitute food product manufacturer to fortify his products will be substantially diminished by the requirements of the KADPA since he will be forced to include the derogatory term "artificial" to his package label even if the substitute product is the nutritionally equivalent of its standardized counterpart.

CONCLUSIONS OF LAW

CALM contends first that the labeling requirements of the KADPA are preempted by the federal law under the Supremacy Clause of the United States Constitution. The defendants assert that the KADPA is not in conflict with federal law and does not stand as an obstacle to the objectives of the FDCA.

The United States Supreme Court recently interpreted the doctrine of preemption in *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). The Court noted the following ways in which federal law may supersede state law: (1) where preemption is expressly provided by Congress; (2) where the scheme of federal regulation is sufficiently comprehensive to leave no room for supplementary state regulation; (3) where the field is one in which the federal interest is inherently dominant; (4) where the state law conflicts with the federal law so that compliance with both is not possible; and (5) where state law stands as an obstacle to the accomplishment and execution of the federal objectives. *Id.,* at 713, 105 S.Ct. at 2375. Federal law includes federal regulations as well as statutes. *Id.*

CALM suggests that the KADPA is invalid because of federal occupation of the field; actual conflict with federal law; and because KADPA stands as an obstacle to the accomplishment of the objectives of the federal regulations promulgated by the FDA.

■ Preemption in this case arises, if at all, because the KADPA conflicts with federal law or stands as an obstacle to accomplishment and execution of federal objectives. Preemption is not mandated because Congress has expressly provided it since the FDCA contains no express provision. Nor is preemption required because the scheme of federal regulation is sufficiently comprehensive to leave no room for supplementary state regulation or is a field in which the federal interest is inherently dominant. *Grocery Manufacturers of America, Inc. v. Gerace*, 581 F.Supp. 658, 667 (S.D.N.Y.1984), *aff'd in part and rev'd in part*, 755 F.2d 993 (2d Cir.1985), *cert. denied*, 474 U.S. 820, 106 S.Ct. 69, 88 L.Ed.2d 56 (1985). We agree with the following statements of the district court in *Gerace* on this point:

> The principal focus of the FDCA is to "keep impure and adulterated [food and] drugs out of the channels of commerce." *62 Cases of Jam v. United States*, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951). The federal labeling provisions in question here were specifically "designed to protect the public from inferior foods resembling standard products but marketed under distinctive names. *See* S.Rep. No. 361, 74th Cong. 1st Sess. 8–11." *Id.* at 600, 71 S.Ct. at 520. Nothing in the FDA regulations necessarily reflects an intention by the FDA to displace the imitation food labeling requirements of a state. The statute itself does not reveal an unmistakable intention to oust state regulation. Moreover, plaintiff has not demonstrated that there is an overwhelming need for national uniformity or that the statute was designed to create such uniformity. Thus, there is no persuasive reason for me to find that Congress intended to occupy the field. *Cf. Swift & Co. v. Wickham*, 364 F.2d 241, 244 (2d Cir.1966) (the court, in dicta,

notes that the FDCA does not preempt state regulation), *cert. denied*, 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967).

The court shall proceed directly to CALM's contention that the KADPA stands as an obstacle to accomplishing the purposes of federal law. The purposes of the federal food labeling laws are to avoid misbranding of food and to inform the consumer of the actual characteristics and properties of food products. The adoption of regulations by the FDA concerning "imitation" food products was to further these purposes and to encourage the development of nutritious foods.

■ The provisions of the KADPA serve to obstruct the aforementioned goals of federal law for several reasons. First, the requirements of the KADPA provide misleading and inaccurate information to consumers, contrary to the objectives of the FDCA and its regulations. The term "artificial" indicates to the consumer that the product is synthetic. Webster's New Collegiate Dictionary defines "artificial" as "man-made." The substitute dairy products manufactured by the members of CALM, however, contain only natural products. They contain casein and vegetable oil which are as natural as milkfat. Thus, the consumer is not properly informed as to the actual characteristics and properties of the food product as desired by the FDCA. Further, the addition of the word "artificial" to a product's label creates the misimpression that the product is nutritionally inferior. This, of course, may not be the case since the substitute product may be nutritionally equivalent or superior to its standardized counterpart. Finally, the use of "artificial" on products which may already be labeled as "imitation" completely interferes with the goals of the FDA in promulgating regulations concerning imitation products. The addition of the phrase "artificial dairy product" to the labels of all substitute dairy products will either swallow up or blur the labeling distinction created by the federal regulations between standardized dairy products and less nutritious "imitation" products. The labeling

requirements of the KADPA will leave Kansas consumers in a profound state of confusion. Nutritionally equivalent substitutes will bear the designation "artificial dairy product" connoting inferiority, while nutritionally inferior substitutes will now convey the perplexing and nonsensical message that the product is an "artificial-imitation."

Second, the labeling requirements of the KADPA serve to frustrate the goal of the FDA's regulations in promoting the development of nutritionally superior products. The KADPA requires that all substitute dairy products carry the pejorative label "artificial dairy product." This requirement will obstruct the federal policy to promote the development of nutritionally superior products since manufacturers will have no incentive to fortify their products if they will be branded in a manner connoting inferiority anyway.

In *Grocery Manufacturers of America, Inc. v. Gerace, supra,* the New York legislature passed legislation requiring substitute products to be labeled "imitation" regardless of nutritional equivalence. This legislation was held to be an obstacle to the achievement of the purposes of the FDCA and, therefore, was preempted under the Supremacy Clause. 581 F.Supp. at 688, 755 F.2d at 1001. The only difference between the New York law and the KADPA is that Kansas imposes the term "artificial" instead of "imitation." The court believes that this is a distinction without a difference because the terms are synonymous. The Kansas courts, including this court, have recognized that "artificial" and "imitation" have similar meanings. *See, e.g., General Foods Corp. v. Priddle,* 569 F.Supp. 1378, 1384 (D.Kan.1983); *Coffee Rich, Inc. v. Kansas State Board of Health,* 192 Kan. 431, 388 P.2d 582, (1964). Moreover, consumers recognize the terms as substantially equivalent. Thus, we find the decision in *Gerace* persuasive here despite the legislature's adoption of "artificial" rather than "imitation" to describe the products manufactured by the members of CALM.

In sum, we find that the provisions of the KADPA stand as an obstacle to accomplishing the objectives of federal law and must be struck down under the Supremacy Clause. States are free to supplement the federal labeling requirements, but such legislation must not stand as an obstacle to the objectives sought to be obtained by the federal law. Here, the KADPA interferes with the accomplishment and execution of the full purposes and objectives of the FDA's regulations. The court, therefore, holds that the provisions of the KADPA are unconstitutional.

Given this holding, the court finds it unnecessary to consider the other arguments made by the plaintiff. The other arguments made by the plaintiff are persuasive as well, but little would be served by an extended discussion of these contentions.

In accordance with the foregoing discussion, the court shall grant judgment to the plaintiff and against the defendants.

IT IS THEREFORE ORDERED that the Kansas Artificial Dairy Products Act, K.S.A. 65–761 *et seq.,* be hereby declared in violation of the Supremacy Clause of the United States Constitution. Judgment shall therefore be entered for the plaintiff. Defendants are hereby permanently enjoined from enforcing or attempting to enforce the Kansas Artificial Dairy Products Act.

IT IS SO ORDERED.